[62 NYS3d 68]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ALEX
FLORES, LUCIO RAMIREZ, BENIGNO AGUILAR and EMMANUEL
FLORES, Appellants.

Second Department, July 5, 2017

184

APPEARANCES OF COUNSEL

*Leonard J. Levenson*, New York City, for appellants.

*David M. Hoovler, District Attorney*, Goshen (*Robert H. Middlemiss* of counsel), for respondent.

## OPINION OF THE COURT

LEVENTHAL, J.

In these consolidated appeals, where one brief was filed on behalf of all four defendants, several issues are presented relating to the empaneling of an anonymous jury. We hold that the trial court's empaneling of an anonymous jury, in violation of CPL 270.15, deprived the defendants of their right to a fair trial, and that error cannot be deemed harmless. Accordingly, we reverse the judgments of conviction and order a new trial.

Background

The defendants, having been accused of multiple crimes, including gang assault in the first degree, were tried together. Before jury selection began, the attorneys for the defendants learned that the County Court intended to withhold the names of the prospective jurors, and instead identify them by only numbers. The attorney for the defendant Emmanuel Flores objected to the procedure, stating, in part:

> "The Court, I believe, intends today to only work from numbers for jurors, like anonymous jurors, rather than giving their names, and on the record I wish to object to the nature of that proceeding, given the fact that this is a gang assault case. The

Court has allowed under *Ventimiglia* [*People v Ventimiglia*, 52 NY2d 350 (1981)] evidence of gang membership somehow impacting on it, and the jurors are going to be led to believe before we even get to the point of taking testimony that there is some big secret event that they would have to be protected from. And I highly object to it. I find it irregular. Thank you."

The attorney for the defendant Lucio Ramirez joined in the oral application. Ramirez's attorney proposed, "[a]s a compromise," that the names of the prospective jurors be made available to the attorneys, but that the attorneys not publicly disclose them.

The other two defense attorneys also joined in the application. The attorney for the defendant Benigno Aguilar suggested that the court could come up with a way of revealing the names of the prospective jurors only to the attorneys. Additionally, Aguilar's attorney urged, "it's going to highlight for . . . these jurors, that this is a gang case in which they have to be concerned for their safety. That has not been shown, and I would object."

The County Court responded:

"There is no constitutional right for the attorneys of the defendants or for the defendants themselves to actually know the names of the jurors. I am aware of no cases that prohibit anything like that. It's done almost as a matter of course in many jurisdictions.

"Again, I'm not going to provide the names to counsel since they then have a duty to provide them to their clients since they are not going to be able to withhold anything from their clients.

"In any event, the numbers will stand, and your objection is part of the record. So noted."

In further discussion, the County Court stated, "[t]his is a tempest in a teapot. There is no constitutional right to have the names of the jury members published. There is none, and in many jurisdictions it's done just as a matter of course." The court added, "I think we're probably going to do it in every trial that we're going to do."

Later, the attorney for Emmanuel Flores argued that an anonymous jury was not permitted under "the statute" (at a

later point, that attorney referred to "270.15"), but the County Court declined to change its prior determination. Thereafter, prospective jurors, and, subsequently, sworn jurors, were identified by assigned numbers and not by their names.

Following a lunch recess, the County Court stated, in part:

> "There was an objection with regard to this having numbers for the jury. I just want to be real clear about this because when I told you before I've been doing this for almost 22 years now. . .

> "I know the last five years an increasing number of jurors told me that A, they feel uncomfortable walking in and out of the courtroom to their cars; B, they feel really uncomfortable giving their names, especially in violent felonies. And after speaking to [the Commissioner of Jurors] about it, she told me that's exactly the same feedback she gets, that jurors are uncomfortable about those two things, especially having their names in the courtroom.

> "Now, my intent is to get as many jurors as we can possibly get to serve. And I think that because of that, I think that it limits the number of jurors that we get because they don't want to go through that worry and stress . . . about this because these are violent felonies. You know and I know we deal with this stuff every day, jurors don't. And that's the reason. It's not specifically this case, but that's the reason it's happening more and more and more often.

> "So that's the reason."

The attorney for Emmanuel Flores said that although he "respect[ed] the decision," he requested that the court explain its reason to the prospective jurors so that the prospective jurors would not think that there was some other reason that their names were not being used.

The County Court responded that prospective jurors would not know that, usually, their names would be revealed, and that raising the issue might be prejudicial to the defendants. The court said that it would give an instruction about not using the names of the prospective jurors "[i]f all four of you [defense attorneys] agree to that . . . but I won't do it over anybody's objection." The attorney for Ramirez objected to the instruction and renewed his "objection to the anonymous pro-

cedure." The court said that, since not all the defense attorneys consented, it would not give an instruction.

In continued discussion, the prosecutor and the attorney for the defendant Emmanuel Flores cited to trial court decisions holding that anonymous juries were impermissible. The County Court commented that it found no controlling authority holding that anonymous juries were impermissible. The court stated that it knew that anonymous juries had been used in the past.

The next day, Aguilar's attorney argued that an anonymous jury would preclude the attorneys from speaking with the jurors following trial in an effort to impeach the verdict "if it comes to that." The County Court stated that it would adhere to its determination. Aguilar's attorney requested that the court maintain the names of the selected jurors. The court agreed to the request and, when Ramirez's attorney joined in the request, the court responded, "I assume all of you do."

Jurors were sworn on a Friday. On the next court date, a juror brought a concern to the court's attention. The juror, under oath, said that as she walked to her car parked in the court parking lot on Friday afternoon, one of the defendants, who was in the presence of approximately eight other people, stood in front of her car and stared at her as she was "going into the car." Noticing this defendant staring at her, the juror felt "[u]ncomfortable, a little intimidated." The defendant was Aguilar, who was the only defendant free on bail.

The County Court excused that juror from the jury. The prosecutor made an oral application to revoke Aguilar's bail. The prosecutor argued that there was "clear intimidation of a juror." In denying the prosecutor's application, the court commented, in part, "[b]ecause the jury parking was not segregated, I don't know where this [defendant's] car was. I don't know whether he was at his car, he was near his car, I just don't know."

During the course of the trial, the People presented evidence that the defendants were part of a group that surrounded the victim, kicked him, hit him with weapons, and stabbed him. Allegedly, the defendants were members of a gang and the victim was a member of a rival gang.

The jury found each defendant guilty of multiple crimes including gang assault in the first degree. The County Court rendered judgments of conviction. Each defendant appeals from

his respective judgment of conviction. This Court, by decision and order on motion, inter alia, granted that branch of the defendants' motion which was to consolidate the appeals. We reverse the judgments of conviction and order a new trial.

## The County Court Erred in Empaneling an Anonymous Jury

The defendants argue that the County Court contravened CPL 270.15 (1) (a) by empaneling an anonymous jury. The People respond that the defendants' contention is unpreserved for appellate review, and that, in any event, empaneling an anonymous jury was proper under the circumstances of this case.

Initially, we reject the People's claim that the issue of whether the County Court properly empaneled an anonymous jury is unpreserved for appellate review. Before jury selection began, the attorney for Emmanuel Flores objected to the court empaneling an anonymous jury, stating, in part, that this was a gang assault case, that the court ruled that it would permit evidence relating to gang membership, and that "the jurors are going to be led to believe before we even get to the point of taking testimony that there is some big secret event that they would have to be protected from." The other defense attorneys joined in the objection. Aguilar's attorney urged, "it's going to highlight for this, these jurors, that this is a gang case in which they have to be concerned for their safety. That has not been shown, and I would object." Thus, the defense attorneys registered specific protests to the court empaneling an anonymous jury at a time when the court had an opportunity to change its ruling. Under the circumstances, the defendants' contention is preserved for appellate review (*see* CPL 470.05 [2]).

■ Turning to the issue of whether empaneling an anonymous jury contravened CPL 270.15 (1) (a), we begin by noting that a court, in interpreting a statute, should attempt to effectuate the intent of the legislature (*see Majewski v Broadalbin-Perth Cent. School Dist.*, 91 NY2d 577, 583 [1998]). The best evidence of the legislature's intent is the text of the statute itself (*see Matter of Theroux v Reilly*, 1 NY3d 232, 239 [2003]). Where the statutory language is clear and unambiguous, a court should construe it so as to give effect to the plain meaning of the words used (*see Commonwealth of the N. Mariana Is. v Canadian Imperial Bank of Commerce*, 21 NY3d 55, 60 [2013]).

CPL 270.15 (1) (a) provides, in part, "the court shall direct that the names of not less than twelve members of the panel be drawn and called as prescribed by the judiciary law."

CPL 270.15 (1-a) provides:

"The court may for good cause shown, upon motion of either party or any affected person or upon its own initiative, issue a protective order for a stated period regulating disclosure of the business or residential address of any prospective or sworn juror to any person or persons, other than to counsel for either party. Such good cause shall exist where the court determines that there is a likelihood of bribery, jury tampering or of physical injury or harassment of the juror."

Read together, these sections of CPL 270.15 prohibit a trial court from withholding the names of prospective jurors. The plain language of CPL 270.15 (1) (a) provides that the names be called. CPL 270.15 (1-a) allows for the issuance of a protective order regulating disclosure of addresses. It does not allow for the issuance of a protective order regulating disclosure of names.*

Trial courts in this state have reached the same conclusion that we now reach. In *People v Watts* (173 Misc 2d 373 [Sup Ct, Richmond County 1997]), the court concluded that the CPL prohibited selection of an anonymous jury (*see id.* at 375). In *Watts*, the court also referred to *People v Gotti*—a case reprinted in *United States v Perry* (754 F Supp 202 [D DC 1990])—where the court concluded that the CPL prohibited the empanelment of jurors whose names were not disclosed (*see People v Watts*, 173 Misc 2d at 375). Likewise, in *People v Owens* (187 Misc 2d 272 [Sup Ct, Monroe County 2001]), while granting the defendant's motion to prohibit disclosure of the names and addresses of prospective and sworn jurors to the media or public, the court stated, "[t]he names of prospective jurors shall continue to be disclosed to the parties, since defendant and all counsel have a statutory right to learn such names" (*id.* at 273).

The term "anonymous jury" has been used to describe various situations where courts withhold juror information. For

---

* Judiciary Law § 509 (a), which shields from disclosure juror qualification questionnaires as well as those portions of other records containing information obtained from the questionnaires (*see Matter of Newsday, Inc. v Sise*, 71 NY2d 146, 152 [1987]), does not alter the way that prospective jurors are to be drawn and called in accordance with CPL 270.15.

example, in *State v Sandoval* (280 Neb 309, 788 NW2d 172 [2010]), the court explained,

> "The term 'anonymous jury' encompasses the withholding of a broad spectrum of information. Generally, an 'anonymous jury' describes a situation where juror identification information is withheld from the public and the parties themselves . . .
>
> "The least secretive form of an anonymous jury is where only the jurors' names are withheld from the parties. This procedure may also be called an innominate jury or, if jurors are referred to by number rather than name, a numbers jury" (280 Neb at 325-326, 788 NW2d at 195 [citations omitted]).

Here, we refer to what the County Court did as empaneling an anonymous jury, because the court referred to the prospective jurors by assigned numbers and not by their names. Based on the above sections of CPL 270.15, and consistent with trial court decisions interpreting the statute, this was error.

We note that in *Watts*, in examining the issue of anonymous juries, the trial court found that a defendant's statutory right to knowledge of jurors' names may be forfeited "where the acts of a defendant represent a clear threat to either the safety or integrity of the jury" (*People v Watts*, 173 Misc 2d at 377). We need not, however, decide at this juncture whether there may ever be circumstances in which a defendant can forfeit the right to know the names of prospective and empaneled jurors because in this case, the County Court's decision to empanel an anonymous jury was not based on the defendants' conduct. Rather, the court acted on its own initiative based on concerns expressed by jurors who served in prior trials. In addition, while our dissenting colleague points out that CPL 270.15 (1-a) permits the court, for good cause shown, to issue a protective order shielding disclosure of jurors' addresses from defendants, no such good cause was shown here. Even though one of the jurors said that a defendant stood in front of her car and stared at her as she was "going into the car" in the court parking lot, causing her to feel "[u]ncomfortable, a little intimidated," the record does not establish that this encounter involved an attempt to intimidate that juror. As the court stated in denying the prosecutor's application to revoke Aguilar's bail, "[b]ecause the jury parking was not segregated, I don't know where this [defendant's] car was. I don't know whether he was at his car,

he was near his car, I just don't know." In any event, regardless of the circumstances of this parking lot encounter, it would be improper to base the need for a protective order barring disclosure of jurors' addresses on an incident that occurred after an anonymous jury was empaneled.

We turn now to the issue of whether the County Court's error in empaneling an anonymous jury requires reversal.

## The County Court's Error in Empaneling an Anonymous Jury Deprived the Defendants of Their Right to a Fair Trial

The defendants argue that the County Court's error in empaneling an anonymous jury deprived them of their right to a fair trial.

The Court of Appeals has explained that

> "if in any instance, an appellate court concludes that there has been such error of a trial court, such misconduct of a prosecutor, such inadequacy of defense counsel, or such other wrong as to have operated to deny any individual defendant his fundamental right to a fair trial, the reviewing court must reverse the conviction and grant a new trial, quite without regard to any evaluation as to whether the errors contributed to the defendant's conviction" (*People v Crimmins*, 36 NY2d 230, 238 [1975]).

"The right to a fair trial is self-standing and proof of guilt, however overwhelming, can never be permitted to negate this right" (*id.* at 238).

Empaneling an anonymous jury creates a potential for prejudice to a defendant. Empaneling an anonymous jury may deprive a defendant of information that could be used in selecting a jury (*see United States v Morales*, 655 F3d 608, 620 [7th Cir 2011]; *State v Sandoval*, 280 Neb at 327, 788 NW2d at 195; *see also United States v Wong*, 40 F3d 1347, 1376 [2d Cir 1994]), thus threatening "the ability of both defense attorneys and prosecutors to fully investigate jurors for possible bias or interest" (Abraham Abramovsky & Jonathan I. Edelstein, *Anonymous Juries: In Exigent Circumstances Only*, 13 St. John's J. of Legal Comment 457, 468 [1999]). More significantly, empaneling an anonymous jury may undermine the presumption of innocence by conveying, before any evidence is presented, that the defendant is a dangerous person from whom the prospective jurors must be protected (*see United States v Morales*, 655

F3d at 620; *State v Sandoval*, 280 Neb at 327, 788 NW2d at 195; *see also United States v Wong*, 40 F3d at 1376). Although anonymity "may also imply a legitimate concern for juror privacy unrelated to the dangerousness of a defendant . . . in a criminal case, there is a significant risk that members of the jury might infer that their names were being withheld to protect them from defendant or others acting on his behalf" (*State v Sundberg*, 349 Or 608, 620, 247 P3d 1213, 1220 [2011]).

Although courts in other jurisdictions, where there is no statutory prohibition against empaneling an anonymous jury, have found the procedure permissible, these courts have nevertheless cautioned that resort to anonymity is proper only where there is a strong reason to believe that the jury needs protection, and where reasonable precautions are taken to minimize any potential prejudice (*see e.g. United States v Pica*, 692 F3d 79, 88 [2d Cir 2012]; *United States v Morales*, 655 F3d at 620-621; *State v Sandoval*, 280 Neb at 327, 788 NW2d at 195; *Major v State*, 873 NE2d 1120, 1127 [Ind Ct App 2007]; *State v Brown*, 280 Kan 65, 74, 118 P3d 1273, 1281 [2005]; *People v Williams*, 241 Mich App 519, 525, 616 NW2d 710, 714 [2000]; *see also State v Samonte*, 83 Haw 507, 523, 928 P2d 1, 17 [1996]). Reasonable precautions to minimize prejudice, and strike a fair balance between the need to ensure jury safety and the defendant's right to a fair trial, include providing some type of neutral explanation for the procedure, and appropriate instructions (*see United States v Pica*, 692 F3d at 88; *United States v Morales*, 655 F3d at 623; *State v Brown*, 280 Kan at 74, 118 P3d at 1281). An appropriate instruction may include advising the jury that "the use of numbers instead of names should in no way be interpreted as a reflection of the defendant's guilt or innocence" (*State v Brown*, 280 Kan at 74, 118 P3d at 1281).

While the empanelment of an anonymous jury is statutorily prohibited in New York, these cases from other jurisdictions are instructive because of their emphasis on the need for trial courts to take precautions to minimize prejudice. Such precautions must be taken to avoid any inference that anonymity is required because the defendant is a dangerous individual, which may impair the presumption of innocence. Here, the County Court took no precautions to minimize the potential prejudice. The court gave no instruction, for example, that the use of numbers instead of names to identify prospective jurors should not be viewed as a reflection on the guilt or nonguilt of

the defendants. The court eventually offered to give an instruction about not using the names of the prospective jurors, but it conditioned giving this instruction on the agreement of all the defense attorneys, and declined to give an instruction when not all the defense attorneys agreed.

Since the County Court took no steps to lessen the potential prejudice, any voir dire questions that the defense attorneys could have asked the prospective jurors in an effort to determine the prejudicial effect merely would have served to draw further attention to the empaneling of an anonymous jury. Also, while the court agreed to retain the names of the selected jurors to enable the defense attorneys to contact the jurors following the verdict, this would not undo the prejudice that might have been done by the empaneling of an anonymous jury. Besides, following the verdict, the jurors were under no obligation to speak with the defense attorneys, and, even if they chose to speak with the defense attorneys, they were no longer under oath.

On this record, where the County Court took no precautions to minimize the potential prejudice, we hold that the trial court's empaneling of an anonymous jury, in violation of CPL 270.15, deprived the defendants of their self-standing right to a fair trial. Accordingly, this Court must reverse the judgments of conviction and order a new trial, without regard to any evaluation as to whether the error contributed to the convictions.

Harmless Error Analysis Should Not be Applied to This Type of Error

The People argue that any error was harmless.

█ In light of our conclusion that the defendants were deprived of their self-standing right to a fair trial, we must reverse the judgments of conviction and order a new trial, without regard to any evaluation as to whether the error contributed to the convictions. In other words, because the defendants were deprived of their right to a fair trial, the error cannot be deemed harmless.

Our dissenting colleague notes that courts in other jurisdictions have applied harmless error analysis to error relating to the empaneling of an anonymous jury (*see e.g. United States v Morales*, 655 F3d at 621-624 [concluding that the Federal District Court erred by ordering the use of an anonymous jury without articulating its reasons for doing so, but that this error was harmless]; *Major v State*, 873 NE2d 1120, 1129 [2007] ["In

light of the rarity of structural errors and the precedent establishing that a harmless error analysis may be applied to the anonymous jury question, we conclude a harmless error analysis is applicable to the case at hand"]). However, even if we had occasion to consider whether the error could be deemed harmless, we would conclude that harmless error analysis should not be applied to this type of error. We note, moreover, that none of the decisions cited by the dissent indicate that the jurisdiction involved had a statute analogous to CPL 270.15.

"Harmless error rules were originally enacted to relieve the courts and the public generally of the needless expense of retrying cases in which the result would be the same after the error had been corrected" (*People v Grant*, 45 NY2d 366, 378 [1978] [internal quotation marks omitted]).

> "Harmless error rules generally involve consideration of two factors. 'The first of such factors is the quantum and nature of proof of the defendant's guilt if the error in question were to be wholly excised. The second is the causal effect which it is judged that the particular error may nonetheless have had on the actual verdict' " (*id.* at 378, quoting *People v Crimmins*, 36 NY2d at 240).

Typically, harmless error analysis is applied to trial errors, where evidence, argument, or instruction was improperly presented to, or improperly precluded from, the jury during trial (*see e.g. People v Ellison*, 138 AD3d 1137, 1138 [2016] [the error in admitting at trial the defendant's videotaped statement to law enforcement officials was harmless]; *People v Deokoro*, 137 AD3d 1297, 1297-1298 [2016] [to the extent that some of the prosecutor's summation comments were improper, those remarks did not deprive the defendant of a fair trial, and any other error in this regard was harmless]; *People v Stevenson*, 129 AD3d 998, 999 [2015] [the court's error in granting the People's request to charge the jury, over the defendant's objection, regarding intoxication was harmless]).

While we acknowledge that harmless error analysis has been applied to potentially analogous types of errors (*see e.g. People v Clyde*, 18 NY3d 145, 148 [2011] ["We hold that harmless error analysis is applicable when a trial court has ordered the use of visible shackles without adequate justification articulated on the record"]; *People v Grant*, 7 NY3d 421, 424 [2006] ["*Sandoval* error is properly subject to harmless-error analysis"]), we do not believe that an appellate court may adjudge

the causal effect that the error in empaneling an anonymous jury might have had on the jury's verdict. The error here relates not to evidence, argument, or instruction that was improperly presented to, or improperly precluded from, the jury during trial, but to the message the court sent to the prospective jurors about the defendants before any evidence was presented, argument was made, or instruction was given. There is no way of knowing what causal effect this particular error, which impacted on the presumption of innocence, might have had on the verdicts.

Moreover, the possibility that prospective jurors might have drawn a conclusion that the defendants were dangerous was heightened by the fact that at least some of the prospective jurors had previously served on a jury (*see State v Sunderland*, 349 Or at 625, 247 P2d at 1222). These prospective jurors, and others who, through film, television, or other sources were familiar with this State's jury system, likely would have been aware that the empaneling of an anonymous jury was a departure from typical procedure, and it is likely that they would have attributed the need for such a departure to the perceived dangerousness of the defendants.

Remaining Contentions

The defendants' challenges to the legal sufficiency of the evidence are unpreserved for appellate review (*see* CPL 470.05 [2]; *People v Kolupa*, 13 NY3d 786, 787 [2009]; *People v Hawkins*, 11 NY3d 484, 492 [2008]). In any event, viewing the evidence in the light most favorable to the prosecution (*see People v Contes*, 60 NY2d 620 [1983]), we find that it was legally sufficient to establish the defendants' guilt beyond a reasonable doubt. Moreover, in fulfilling our responsibility to conduct an independent review of the weight of the evidence (*see* CPL 470.15 [5]; *People v Danielson*, 9 NY3d 342 [2007]), we nevertheless accord great deference to the jury's opportunity to view the witnesses, hear the testimony, and observe demeanor (*see People v Mateo*, 2 NY3d 383, 410 [2004]; *People v Bleakley*, 69 NY2d 490, 495 [1987]). On reviewing the record here, we are satisfied that the verdicts of guilt were not against the weight of the evidence (*see People v Romero*, 7 NY3d 633 [2006]).

The hearing court properly denied that branch of Ramirez's omnibus motion which was to suppress identification testimony, as the showup identification procedure at issue, which occurred in close temporal and spatial proximity to the crime, within 30

minutes after the crime occurred, about 10 to 15 blocks from the crime scene, was not unduly suggestive (*see People v Mack*, 135 AD3d 962, 963 [2016]; *People v Gonzalez*, 61 AD3d 775, 776 [2009]; *People v Berry*, 50 AD3d 1047, 1048 [2008]). Contrary to Ramirez's contention, the showup was not rendered unduly suggestive merely because he was handcuffed and in the presence of uniformed police officers and police cars (*see People v Duuvon*, 77 NY2d 541, 544 [1991]; *People v Mack*, 135 AD3d at 963; *People v Jerry*, 126 AD3d 1001, 1002 [2015]).

The defendants' contentions that the County Court erred in permitting the People to present expert testimony on gang culture in general and as to the specific customs and practices of rival gangs in the City of Newburgh, and in qualifying the People's witness as an expert in those areas, are partially unpreserved for appellate review, as they argued at trial that the subject matter of his proposed testimony was not relevant and not, as they partially argue now, that the witness did not have the requisite training and education (*see* CPL 470.05 [2]). In any event, the witness, Detective Cortez, demonstrated through his foundational testimony that he possessed the skill, training, knowledge, and experience necessary to proffer an opinion on gang culture in general and on the La Eme and BBK gangs in Newburgh in particular (*see People v Mazariego*, 117 AD3d 1082, 1084 [2014]; *People v Washington*, 108 AD3d 576, 577 [2013]). The testimony was relevant to background information, the defendants' motive for carrying out the crimes, the accessorial culpability of the defendants, and the defendants' relationship to the victim (*see People v Lazaro*, 125 AD3d 1007 [2015]; *People v Guevara*, 96 AD3d 781 [2012]; *People v Devers*, 82 AD3d 1261-1263 [2011]; *People v Cruz*, 46 AD3d 567, 568 [2007]; *People v Flores*, 46 AD3d 570, 571 [2007]; *People v Ramirez*, 23 AD3d 500, 501 [2005]; *People v Cain*, 16 AD3d 288, 288-289 [2005]; *People v Filipe*, 7 AD3d 539, 540 [2004]). Moreover, the probative value of the testimony outweighed any prejudice to the defendants from its admission (*see People v Lazaro*, 125 AD3d at 1007; *People v Guevara*, 96 AD3d at 781; *People v Flores*, 46 AD3d at 571; *People v Filipe*, 7 AD3d at 540).

In light of our determination, we need not reach the defendants' remaining contention.

Conclusion

The County Court's empaneling of an anonymous jury, in violation of CPL 270.15, deprived the defendants of their right

to a fair trial. Accordingly, the judgments are reversed, on the law, and a new trial is ordered.

DILLON, J.P. (dissenting). This is the first case in New York State in which an appellate court examines the circumstances under which a trial court may or may not withhold juror names and addresses pursuant to CPL 270.15 in a criminal action. While I agree with my colleagues in the majority that the County Court erred in not disclosing during jury selection and trial the actual names of the jurors, and in not disclosing address information to counsel during voir dire, I conclude that such error was harmless.

## I. Relevant Facts

The defendants Alex Flores (hereinafter A. Flores), Lucio Ramirez, Benigno Aguilar, and Emmanuel Flores (hereinafter E. Flores; collectively the defendants) were each indicted for gang assault in the first degree, gang assault in the second degree, assault in the first degree, and assault in the second degree (two counts). Aguilar and Ramirez were also indicted for criminal possession of a weapon in the fourth degree, arising out of an incident that allegedly occurred on September 6, 2009, near the intersection of Hasbrouck and Mill Streets in Newburgh. Two other indicted defendants, Christian Vacaro and Anselmo Bravo, entered pleas of guilty prior to the trial, and the trial of another defendant, Eduardo Perez, was severed.

At the date, time, and place of the occurrence, Freddy Gonzalez, a member of a gang called "BBK" was attacked on the street by several members of a rival gang, La Eme, which allegedly included the defendants. Gonzalez was surrounded and fell to the ground, where he allegedly was hit and kicked by the group, beaten with a bat and other instruments, and stabbed in the chest by Aguilar, resulting in a punctured lung. The attack ceased upon the sound of a gunshot. The beating was witnessed by two individuals, both of whom saw some of the assailants leave the scene in a dark-colored Jeep Cherokee or similar vehicle. One of the witnesses and her friend followed the Jeep Cherokee in a van, and the witness called the police to describe the Jeep Cherokee as having a back light that was not working.

A gray Jeep Cherokee that matched the description given by the witness, with a broken left brake light, was stopped by police at South William Street near John Street. The four occupants of the vehicle were the defendants Vacaro, Perez,

Bravo, and Ramirez. A metal baseball bat with what appeared to be blood on it was recovered from the vehicle's hatchback, and there was a black or blue bandana around its steering column. Sergeant Christopher Swenson, who took custody of the Jeep Cherokee, estimated that it was stopped at a location that was 10 or 15 blocks from the attack on Gonzalez, and a three- or five-minute drive from that location. The vehicle was registered to Fermin Flores at a Newburgh address, and it was stipulated that Fermin Flores was the father of the defendants A. Flores and E. Flores.

DNA evidence was introduced that linked the victim, Gonzalez, to the blood found on the bat recovered from the Jeep Cherokee and to blood found at the scene of the attack.

The witnesses, who returned to the scene of the attack when the Jeep Cherokee was pulled over by police, were transported to the location of the vehicular stop by the police. The witnesses each identified Vacaro, Perez, Bravo, and Ramirez, one at a time, through the open door of the police vehicle which had brought them. At that time, those four defendants were handcuffed outside the Jeep Cherokee approximately 15 feet from the two witnesses. It was dark outside but the area was generally illuminated by the headlights of six or seven police cars in the area, although no specific light was focused on any particular defendant. The showup identifications were conducted between 1:40 and 1:44 a.m., approximately half an hour after the attack upon Gonzalez.

Gonzalez was taken to St. Luke's Hospital where he was diagnosed with a fractured arm, a fractured kneecap, lacerations, multiple stab wounds, and a collapsed lung. At trial, Gonzalez testified that, prior to the attack, a window on his car had been broken and its tires slashed, and on another occasion, Aguilar had been arrested for throwing bottles at his car. As a result of that earlier arrest, Gonzalez had received an order of protection against Aguilar on January 26, 2009.

During the People's case, the County Court permitted Detective Joseph Cortez to testify as an expert witness on gang culture in general, and on the customs and practices of rival gangs in Newburgh in particular. During his testimony, Cortez described the nationalities of BBK and La Eme members, the geographic turf of those groups within Newburgh, their graffiti, colors, clothing, loyalties, finger signs, tattoos, and street names, and their commonly used weapons.

The defense case consisted of testimony by five of the defendants' friends and relatives providing an alibi for the defend-

ants' whereabouts at the time of the attack on Gonzalez. E. Flores also testified consistently with the testimony of the alibi witnesses.

At the outset of jury selection, the County Court advised the prosecutor and defense attorneys that jurors would remain anonymous and be identified solely by numbers. The attorney for E. Flores initially objected to the procedure and requested that at least the attorneys be provided with the jurors' names. The subject came up again shortly thereafter when the trial judge explained that in the previous five years, an increasing number of jurors had told him that in cases of violent felonies, they were uncomfortable giving their names and walking to their cars in the parking lot by the courthouse. The attorney for E. Flores requested that the court explain its reasoning to the prospective jurors so the jurors would not speculate that there "must be something secretive." However, Ramirez's attorney objected to such a charge and to the entirety of the procedure. The court declined to give any special instruction to the jurors absent the consent of all counsel.

The following day, Aguilar's attorney raised a new objection to the selection of an anonymous jury. He argued that it would prevent counsel after trial from speaking with jurors to potentially impeach the verdicts. Although the County Court denied the objection on that basis, it agreed to counsel's alternative suggestion that the jurors' names be retained for any potential posttrial uses by counsel.

After the jurors were selected on a Friday, but before the County Court gave its preliminary instructions to them the following Monday, an incident occurred involving a female juror at her car in the courthouse parking lot. Specifically, Aguilar, who was the only defendant free on bail, and seven other persons allegedly stood in front of the juror's car and stared at her as she walked from the courthouse to her car on that Friday. The juror was concerned enough to report the matter to the court on Monday, which placed her under oath in the presence of counsel. The juror described the incident as making her feel "[u]ncomfortable, a little intimidated." As a result, the court discharged the juror from further service. There was no jury-related application by any of the defendants after the defendants were convicted of the charges against them.

Upon their convictions, A. Flores and E. Flores were each sentenced to concurrent determinate terms of imprisonment of 18 years upon their convictions of gang assault in the first

degree, 15 years upon their convictions of gang assault in the second degree, 18 years upon their convictions of assault in the first degree, and seven years upon each of their two convictions of assault in the second degree, to be followed by postrelease supervision. Ramirez received the same sentences plus a concurrent definite term of incarceration of one year upon his conviction of criminal possession of a weapon in the fourth degree. Aguilar received the same sentences as Ramirez, except he received a determinate term of imprisonment of 20 years upon his conviction of gang assault in the first degree.

## II. Witholding Juror Information

The defendants contend that the County Court violated their statutory rights under CPL 270.15 (1) (a) and (1-a) when it empaneled an anonymous jury, identifying each juror during jury selection and during trial only by number. Contrary to the People's contention, and under the circumstances of this case, the defendants preserved for appellate review their arguments that the court erred in withholding juror information from the defendants and their counsel (see CPL 470.05 [2]).

CPL 270.15 (1-a) provides that a court

> "may for good cause shown, upon motion of either party or any affected person or upon its own initiative, issue a protective order for a stated period regulating disclosure of the business or residential address of any prospective or sworn juror to any person or persons, other than to counsel for either party."

"Good cause" is defined in the statute as existing when "there is a likelihood of bribery, jury tampering or of physical injury or harassment of the juror" (CPL 270.15 [1-a]). To date, these statutory provisions have been discussed in only three reported cases in New York: *People v Owens* (187 Misc 2d 272 [Sup Ct, Monroe County 2001]), *People v Watts* (173 Misc 2d 373 [Sup Ct, Richmond County 1997]), and *People v Gotti* (Sup Ct, NY County, Dec. 15, 1989, indictment No. 359/89), as reprinted in *United States v Perry* (754 F Supp 202 [D DC 1990]).

The language of CPL 270.15 (1-a), which allows for the nondisclosure of jurors' business or residential addresses only when circumstances warrant the issuance of a protective order, inferentially establishes that absent a protective order, defendants possess a statutory right to the information (see *People v Watts*, 173 Misc 2d at 375). The defendants concede that their right to know the identities of the jurors may be forfeited by

their own actions (*see id.*), but that in this case, the County Court had issued its protective order at a time when no defendant had engaged in any bribery, tampering, physical injury, or harassment toward any juror.

CPL 270.15 (1-a) was added to the incumbent version of CPL 270.15 by legislative amendment in 1983 (*see* L 1983, ch 684, § 1). An assembly memorandum in support of legislation, contained in the amendment's bill jacket, describes the justification of the amendment as improving the safety of prospective jurors in criminal cases who may face credible threats of harm, intimidation, or bribery, and to enable them to perform their civic duties without fear of reprisal (*see* Mem of Assembly, Bill Jacket, L 1983, ch 684). By protecting information regarding jurors' addresses from disclosure to defendants in appropriate cases, while allowing that such information nevertheless be available to all counsel, the legislature sought to strike an "appropriate balance" between counsel's right to know the jurors' addresses and the necessity of the courts to protect the integrity and safety of the jury (*see* Mem of Executive Chamber dated July 13, 1983, Bill Jacket, L 1983, ch 684 at 8).

The amendment was enacted not long after the federal courts had grappled with the issue of anonymous juries in a series of drug distribution and organized crime cases, culminating in the decision in *United States v Barnes* (604 F2d 121 [2d Cir 1979]). In *Barnes*, the United States Court of Appeals for the Second Circuit held that, in appropriate federal cases, a court's withholding of the jurors' names, addresses, ethnic backgrounds, and religious affiliations served a necessary and valuable purpose of allaying jurors' fears of retaliation by defendants against them and their families, thereby promoting impartial decision-making (*see United States v Barnes*, 604 F2d at 140-141; *see also United States v Scarfo*, 850 F2d 1015, 1022 [3d Cir 1988]; *United States v Thomas*, 757 F2d 1359, 1364 [2d Cir 1985]).

The Second Circuit refined the federal conceptualization of anonymous juries in later cases holding that judges contemplating the empanelment of an anonymous jury engage in a two-step analysis. First, the federal trial judge must conclude that there is strong reason to believe that the jury needs protection. Second, the trial judge must identify and take reasonable precautions to minimize the prejudicial effects on the defendant and to assure that the defendant's fundamental rights remain protected (*see United States v Paccione*, 949 F2d 1183,

1192 [2d Cir 1991]; *United States v Tutino*, 883 F2d 1125, 1132 [2d Cir 1989]; *United States v Persico*, 832 F2d 705, 717-718 [2d Cir 1987]; *United States v Thomas*, 757 F2d at 1365). The first step of the analysis has been met in federal cases involving (1) organized crime (*see United States v Tutino*, 883 F2d at 1132; *United States v Thomas*, 757 F2d at 1364-1365), (2) a defendant's alleged membership or participation in a group entity with the capacity to tamper with or harm jurors (*see United States v Persico*, 832 F2d at 717; *United States v Thomas*, 757 F2d at 1364-1365), (3) defendants who have engaged in past attempts to interfere with judicial processes (*see United States v Vario*, 943 F2d 236, 240 [2d Cir 1991]; *United States v Tutino*, 883 F2d at 1132), (4) the potential for a defendant's lengthy incarceration (*see United States v Tutino*, 883 F2d at 1132), and (5) the likelihood of extensive media publicity coupled with allegations of dangerous or unscrupulous conduct (*see United States v Vario*, 943 F2d at 240; *United States v Tutino*, 883 F2d at 1132; *United States v Persico*, 832 F2d at 717; *United States v Ferguson*, 758 F2d 843, 854 [2d Cir 1985]; *United States v Barnes*, 604 F2d at 141). The second step requires the trial judge to give appropriate charges to the jurors and to allow full and careful voir dires of the veniremembers (*see United States v Thai*, 29 F3d 785, 801 [2d Cir 1994]; *United States v Paccione*, 949 F2d at 1192; *United States v Tutino*, 883 F2d at 1133; *United States v Thomas*, 757 F2d at 1365). The decision whether to empanel an anonymous jury is reviewed by the federal circuit courts under an abuse of discretion standard (*see United States v Quinones*, 511 F3d 289, 295 [2d Cir 2007]; *United States v Thai*, 29 F3d at 801; *United States v Paccione*, 949 F2d at 1192). The foregoing decisional authorities suggest that the empanelment of an anonymous jury is a complicated matter which trial courts must handle with care, to balance the need to protect jurors in certain cases against the legitimate Fifth and Sixth Amendment (US Const Fifth Amend, Sixth Amend) concerns of defendants.

While there is no recognized federal or state constitutional right to know the identities of jurors in criminal cases (*see United States v Vario*, 943 F2d at 239; *United States v Tutino*, 883 F2d 1125 [1989]; *United States v Persico*, 832 F2d 705 [1987]; *United States v Thomas*, 757 F2d 1359 [1985]; *United States v Barnes*, 604 F2d 121 [1979]; *People v Gotti*, Sup Ct, NY County, Dec. 15, 1989, indictment No. 359/89, reprinted in *United States v Perry*, 754 F Supp 202, 204 [D DC 1990]; *People*

*v Watts*, 173 Misc 2d at 373), the New York State Legislature was faced in 1983 with determining whether and to what extent there would be a statutory right to jurors' identifying information. The debate apparently broke down along the lines of whether to permit trial judges to protect from disclosure only business and residential address information versus also protecting from disclosure the jurors' actual names. The language that was ultimately enacted in CPL 270.15 expressly provides that trial judges may protect from disclosure only the jurors' business or residential addresses. Paul A. Feigenbaum, then counsel to the Office of Court Administration, objected to the portion of the proposed amendment that limited protective orders to jurors' addresses without also allowing for the nondisclosure of jurors' names. He maintained that New York law already gave trial judges authority to regulate the scope of criminal voir dire proceedings, which implicitly gave them the right to withhold juror names in appropriate circumstances (*see* Letter of Paul A. Feigenbaum dated July 27, 1983, Bill Jacket, L 1983, ch 684, citing as a *"cf." People v Boulware*, 29 NY2d 135 [1971]). Mr. Feigenbaum argued that an unscrupulous defendant armed merely with a juror's name and a telephone book could circumvent the court's protective order shielding address information, and boldly predicted that, were the amendment of CPL 270.15 to be fully appealed, "the Court of Appeals would find that State trial judges have comparable authority [to shield jurors' names from disclosure as well]" (*see* Letter of Paul A. Feigenbaum dated July 27, 1983, Bill Jacket, L 1983, ch 684 at 10).

Further amendments to the anonymity provisions of CPL 270.15 (1-a) have been proposed during every legislative session between and including 1991-1992 and 2015-2016 (*see* 1991 NY Senate-Assembly Bill S4905, A7521; 1993 NY Senate-Assembly Bill S2628, A5529; 1995 NY Senate-Assembly Bill S5211, A8840; 1997 NY Senate-Assembly Bill S1134, A4555-A; 1999 NY Senate-Assembly Bill S0822, A1411, A9652; 2001 NY Senate-Assembly Bill S0103, A5759; 2003 NY Senate-Assembly Bill S0775, A1542; 2005 NY Senate-Assembly Bill S0661, A8276; 2007 NY Senate-Assembly Bill S0615, A0752; 2009 NY Senate-Assembly Bill S0569, A1464; 2011 NY Senate-Assembly Bill S0947, A6111; 2013 NY Senate-Assembly Bill S1513, A2764; 2015 NY Senate-Assembly Bill S0412; Jose Maldonado, *Anonymous Juries: What's the Legislature Waiting For?*, 66 NY St BJ 40, 43 [July/Aug. 1994]). These bills each proposed that

prosecutors be allowed to make motions to protect from disclosure juror names and addresses, with those motions to be decided under a clear and convincing evidence standard. The bills followed the developed federal law by setting forth delineated factors to be considered by the courts, such as (1) whether the defendant or people associated in an enterprise with the defendant have a history of attempting to tamper with, bribe, or cause physical injuries to or harassment of a juror, (2) the seriousness of the charge(s) against the defendant, and (3) the extent of pretrial publicity. Further, the bills that were proposed in the various legislative sessions since 1991 would have required trial judges, when granting any such motions, to instruct jurors, if requested by the defense, that they not draw any inference from the procedure that is unfavorable to the defendant, and to enlarge the scope and direction of the parties' voir dires to assure that each party has sufficient information on which to exercise challenges. The legislative proposals, however well-crafted they might have been to address Fifth and Sixth Amendment concerns, were passed, at most, by only one house of the state legislature, but never by both; and thus never signed into law (*see People v Watts*, 173 Misc 2d at 377). Most recently, the proposed amendment to CPL 270.15 (1-a), introduced in the senate for consideration during the 2015-2016 legislative session, had no assembly counterpart. Therefore, the controlling statute on this issue remains the original version of CPL 270.15 (1-a), enacted in 1983, which permits the nondisclosure of only the business and residential addresses of jurors to the defendants themselves.

The language of CPL 270.15 (1-a) presents a paradox. In any criminal case where a defendant might be inclined toward juror bribery, tampering, physical injury, or harassment, no such inappropriate conduct will be undertaken with respect to any veniremember that is excused from service at the outset of proceedings or who is not selected to sit on the jury from among the members of the jury pool. Rather, the jurors would first need to be selected and finalized for a defendant to then target any particular juror for inappropriate contact. However, by that time, the jurors' names and addresses will already have been disclosed in the normal course of voir dire, and any protective order that might later be issued as to juror identity could not succeed in placing the proverbial toothpaste back into its tube. Therefore, CPL 270.15 (1-a) only has practical utility if it is interpreted to allow trial judges to issue protective orders

prior to jury selection, as was done here. This necessarily foists upon trial judges the need to be prescient, to "read" people and circumstances, to see what is to be seen, and to act in accordance with the common sense and higher judgment that the court system, lawyers, litigants, and general public may properly expect of the constitutionally elected or appointed jurists of the state.

Here, the trial judge referenced at least five years of experience handling serious felony matters in the Orange County Court. He knew from that experience and from his interaction with jurors that many jurors were reluctant to disclose their identities in serious criminal cases and were anxious about walking to and from their cars in the courthouse parking lot. The defendants correctly note on appeal that the trial judge did not attribute any specific conduct by them that might warrant a protective order shielding disclosure of juror information. However, trial judges are not mere automatons. The trial judge, in this instance, had presided over the defendants' respective *Sandoval* (*see People v Sandoval*, 34 NY2d 371 [1974]) and *Molineux* (*see People v Molineux*, 168 NY 264 [1901]) hearings regarding their prior criminal histories and bad acts, and was aware of the seriousness of the charges and the gang-related nature of the allegations against them. The trial judge mustered his wisdom, experience, and best judgment in sensing that some form of judicial action was required to protect the jurors. Indeed, the trial judge's comments about the concerns of jurors in prior cases walking to and from their cars at the courthouse parking lot proved to be remarkably prophetic. At the conclusion of jury selection and before the preliminary charge in this matter, a female juror encountered one of the defendants and seven of his friends in the parking lot, resulting in her discharge from the panel as a result of perceived intimidation. We have insufficient information for concluding whether the encounter in the parking lot was coincidental, a deliberate intimidation of the juror, or even perhaps an intentional means of removing an "undesirable" juror from the panel without need of a peremptory challenge, but we assume the trial judge providently exercised his discretion in determining that the removal of this juror from the panel was warranted (*see People v Rodriguez*, 71 NY2d 214, 219 [1988]; *People v Michael*, 48 NY2d 1, 10 [1979]).

In my view, the trial judge's issuance of a protective order as to juror address information was proper to the extent applied

to the defendants, as the shielding of such information is expressly permitted by statute (see CPL 270.15 [1-a]). The trial judge's discretionary determination was vindicated by the later encounter between Aguilar and a female juror in the parking lot which, whatever its circumstances, was found sufficient to warrant that juror's removal from the jury. CPL 270.15 (1-a) has no practical purpose or benefit at the outset of the jurors' voir dire unless its language is interpreted as giving trial judges the discretion to invoke its provisions upon a good faith assessment that the nature of the case or of the defendants warrant its use in advance of any problems.

In my further view, however, the County Court erred in shielding from disclosure the names of the jurors during voir dire and trial, and in shielding address information from counsel (cf. People v Perkins, 125 AD2d 816, 817 [1986]), as the express language of CPL 270.15 (1-a) does not provide the trial court with such latitude (see People v Owens, 187 Misc 2d at 273). Although Paul A. Feigenbaum, counsel to the Office of Court Administration in 1983, specifically argued that any amendment to CPL 270.15 include a provision allowing for the full withholding of juror names and addresses, the state legislature did not incorporate that suggestion into the amendment that was enacted. Moreover, the state legislature, while presented with many opportunities to amend the statute in later years when such amendments were repeatedly proposed, has declined to do so. The fact that federal courts allow judges to more broadly withhold the names, addresses, and ethnic and religious backgrounds of jurors during voir dire in certain cases is of no significant moment here, as New York may permissibly provide defendants with a greater degree of rights than that guaranteed by minimum federal standards (see Matter of Lee TT. v Dowling, 87 NY2d 699, 713 [1996]; Matter of Town of Islip v Caviglia, 73 NY2d 544, 556 [1989]).

In July of 1983, shortly before the original version of CPL 270.15 (1-a) was presented to the Governor for signature, Justice David Ritter of the Supreme Court, Orange County, and later of the Appellate Division, Second Department, empaneled an anonymous jury in the armed robbery trial of defendants Judith Clark, David Gilbert, and Donald Weems, referred to in the vernacular as the "Brinks trial," by withholding both the names and addresses of the jurors (see Jose Maldonado, Anonymous Juries: What's the Legislature Waiting For? 66 NY St BJ at 41). However, Justice Ritter's decision to

do so was not at that time subject to the mandates of the statutory amendment to CPL 270.15. Thereafter, in the 1990 state court assault trial of defendants John Gotti and Anthony Guerrieri, Justice Edward J. McLaughlin of the Supreme Court, New York County, while noting the absence of any federal or state constitutional rights of defendants to the names of jurors, held that CPL 270.15 (1-a) permitted a protective order only to the extent of shielding jurors' business and residential addresses. Justice McLaughlin, therefore, denied the portion of the People's motion that sought to also withhold jurors' names from disclosure (*see People v Gotti*, Sup Ct, NY County, Dec. 15, 1989, indictment No. 359/89, reprinted in *United States v Perry*, 754 F Supp 202, 204 [D DC 1990]). The names of the jurors were disclosed in that case despite the fact that Gotti was already known to have compromised a juror in a 1986 federal trial, which resulted in his acquittal on racketeering charges in that earlier matter (*see* Arnold H. Lubasch, *Juror is Convicted of Selling Vote to Gotti*, NY Times, Nov. 7, 1992, at 25, col 4).[1]

The foregoing demonstrates that, with respect to juror anonymity, New York's statutory law is more restrictive than federal decisional law. CPL 270.15 (1-a), as currently constituted, allows, upon good cause shown, the shielding from disclosure to defendants, at most, the jurors' business and residential addresses. It does not, however, shield their identities. In 1983, concerns were expressed regarding potential abuses, such as where a defendant had access to a juror's name and a telephone directory. Now, more than 30 years later, these concerns are heightened since jurors' addresses, family relationships, employment details, and general background information can be immediately obtained at the courthouse from ubiquitous cell phones, tablets, and other electronic devices that are linked to sophisticated computer software, search engines, and social media. In today's world of Internet technology, it may be reasonably argued that CPL 270.15 (1-a), which expressly limits a protective order to jurors' business and residential addresses, affords no real or practical protection whatsoever to jurors who might be exposed in particular cases to bribery, tampering, physical injury, or harassment in the performance of their civic duties.

---

1. Indeed, FBI recordings reportedly taped John Gotti speaking of tampering with the jury in the state court assault trial before Justice McLaughlin, which also ultimately resulted in an acquittal (*see* Selwyn Raab, *FBI Taped Gotti Talks About Fixing Jury*, NY Times, Jan. 8, 1991 § B at 1, col 2).

In contrast, the state legislature nonetheless recognized in another statute the necessity for protecting juror information, specifically including names and addresses. Judiciary Law § 509 (a), which provides for commissioners of jurors to determine the qualification of prospective jurors on the basis of information contained on detailed questionnaires, also provides that "[s]uch questionnaires and records shall be considered confidential and shall not be disclosed." The Court of Appeals has held that Judiciary Law § 509 (a) not only protects juror questionnaire forms from disclosure under the Freedom of Information Law (*see* Public Officers Law § 87 [2] [a]), but also, the "information" reflected on the questionnaires which, if made public, could invade jurors' privacy and safety interests (*see Matter of Newsday, Inc. v Sise*, 71 NY2d 146, 152 [1987]). The legislature has, therefore, at least implicitly, acknowledged a legitimate public policy of affording protections against the unrestrained disclosure of prospective jurors' identifying information, for the sake of both their privacy and safety. Notably, the confidentiality of the jurors' questionnaire is a blanket rule made for all types of cases, and requires no threshold showing that jurors be actually at risk of misconduct by any particular criminal defendant or other person or entity. Judiciary Law § 509 (a) is a recognition by the state legislature of the privacy and safety interests of the citizenry when summoned for jury service. However, the extent to which the broad protections of that statute may be reconciled with the limited protections of CPL 270.15 (1-a) is beyond the scope of these appeals.

Our unanimous conclusion that the County Court erred under CPL 270.15 (1-a) in not disclosing juror names during jury selection and trial, and in not immediately disclosing address information to counsel, does not end our inquiry. The trial decisions of Justice Ritter in *Clark, Gilbert, and Weems*, Justice McLaughlin in *Gotti*, and Justice Goldberg in *Watts*, were never appealed as to issues relating to an anonymous jury and, therefore, no appellate division has yet had occasion to consider whether a violation of CPL 270.15 (1-a) is subject to a harmless error analysis.

Under the circumstances of this case, the error of the County Court in not disclosing jurors' names during jury selection and trial, and of not making address information immediately available to counsel, was harmless. I reach this conclusion upon consideration of the following five factors:

First, the federal and state authorities discussed above reveal that the disclosure of jurors' identities to criminal defendants

is not a recognized constitutional right (*see United States v Vario*, 943 F2d at 239; *United States v Tutino*, 883 F2d 1125 [1989]; *United States v Persico*, 832 F2d 705 [1987]; *United States v Thomas*, 757 F2d 1359 [1985]; *United States v Barnes*, 604 F2d 121 [1979]; *People v Gotti*, Sup Ct, NY County, Dec. 15, 1989, indictment No. 359/89, reprinted in *United States v Perry*, 754 F Supp at 204; *People v Watts*, 173 Misc 2d at 373). Assuming, arguendo, that the issue were to have such constitutional import, even certain nonfundamental constitutional errors are excused when the error is harmless beyond a reasonable doubt; i.e., where the evidence of the defendant's guilt is overwhelming and there is no reasonable possibility that the error might have contributed to the defendant's conviction (*see Chapman v California*, 386 US 18, 23 [1967]; *People v Cedeno*, 27 NY3d 110, 121-122 [2016]; *People v Felder*, 47 NY2d 287, 295-296 [1979]; *People v Crimmins*, 36 NY2d 230, 242 [1975]).

Second, since the defendants' right to juror names is statutory rather than constitutional, the harmless error standard that should actually be applied here is whether the defendants' conviction is supported by overwhelming evidence of guilt, and there is no significant probability that the jury would have acquitted the defendants had it not been for the error or errors which occurred (*see People v Ayala*, 75 NY2d 422, 431 [1990]; *People v Crimmins*, 36 NY2d at 242). This standard is less than that exacted in instances of nonfundamental constitutional error and does not require that the defendants' guilt be proven "indisputably" (*People v Ayala*, 75 NY2d at 431; *see People v Schaeffer*, 56 NY2d 448, 455 [1982]).

Here, the evidence of the defendants' guilt was overwhelming, and there is no significant probability that they would have been acquitted had the jurors' names been disclosed or their addresses immediately provided to counsel. Evidence of the crimes was provided by two civilian eyewitnesses and the victim, Freddy Gonzalez, who testified that various defendants whom they personally knew were engaged in the gang assault upon Gonzalez. Gonzalez's diagnosed wounds were consistent with the described events. Ramirez was observed leaving the scene in a Jeep Cherokee that was stopped by police only a few blocks from the scene, and he was identified by the witnesses at the traffic stop approximately half an hour after the assault occurred. Further, a baseball bat was used in the assault upon Gonzalez, and a bat containing what appeared to be blood was recovered from the Jeep Cherokee. DNA evidence, which was

introduced at the trial, matched the blood on the bat recovered from the vehicle to Gonzalez, the assault victim. The DNA evidence also matched Gonzalez's blood with stains found at the scene of the assault. As explained by Detective Cortez, a bandana found on the vehicle's steering column was comprised of colors similar to the ones attributed to the La Eme gang. Finally, the Jeep Cherokee observed leaving the scene of the assault, with its broken brake light, was registered to the father of A. Flores and E. Flores. They and the other defendants belonged to a rival gang of Gonzalez's gang, BBK, and there had been a prior incident and arrest history between Aguilar and the complainant, Gonzalez.

The defendants' alibi defenses were necessarily rejected by the jury. Each alibi witness was aware of the charges pending against the defendants but was impeached on cross-examination for failing to ever make his or her information available to law enforcement authorities (*see People v Miller*, 89 NY2d 1077, 1079 [1997]; *People v Dawson*, 50 NY2d 311, 321 [1980]; *People v Lindsay*, 131 AD3d 625, 625-626 [2015]; *People v Joseph*, 97 AD3d 838, 839 [2012]; *People v Felipe*, 66 AD3d 919, 919-920 [2009]; *People v Wright*, 62 AD3d 916, 918 [2009]). Moreover, the various witnesses, who were relatives of the defendants with an interest in their acquittals, could not account for all of the defendants' whereabouts during the generally relevant time frame, and Ramirez's sister conceded that she had given her brother the Jeep Cherokee that evening when he left an event with Bravo, Vaccaro, and Perez. Similarly, Aguilar's live-in girlfriend conceded on cross-examination that at approximately 1:30 a.m. on the morning in question, Aguilar had a telephone conversation with someone identified on the caller ID as Ramirez, and that Aguilar left their home immediately after the call.

In addition to the overwhelming evidence of the defendants' guilt, there is no significant probability that the defendants would have been acquitted but for the County Court's failure to disclose the jurors' names and immediately provide address information to counsel. The record is devoid of any evidence that the nondisclosures impaired or prejudiced a full and proper voir dire of prospective jurors or the exercise of appropriate for cause or peremptory challenges. The defendants' attorneys, as a group, did not agree upon, and did not press the court for, any special instruction regarding the jurors' anonymity. To the extent that the ethnic backgrounds of the veni-

remembers may have been a consideration to all attorneys during jury selection, and the nondisclosure of their names might arguably have hindered any such assessments, nothing prevented any of the attorneys from nevertheless asking potential jurors during voir dire about their ethnic and cultural backgrounds, or from having a fair opportunity to ask questions about any other relevant matter (*see* CPL 270.15 [1] [c]; *People v Steward*, 17 NY3d 104, 110 [2011]; *People v Jean*, 75 NY2d 744, 745 [1989]).

A third factor leading to a harmless error conclusion involves the nature of the trial court's error. Some jury-related errors that violate statutory procedure are so fundamental that they cannot be overlooked as harmless, such as the denial to the defendant of the statutorily guaranteed number of peremptory challenges during jury selection (*see People v Marshall*, 131 AD3d 1074 [2015]), providing jury readback of only the prosecutor's summation over defense counsel's objection (*see People v Sullivan*, 160 AD2d 161, 163-164 [1990]), and failing to apprise counsel of the entire content of a jury's note issued during deliberation (*see People v Walston*, 23 NY3d 986, 990 [2014]; *People v Tabb*, 13 NY3d 852, 853 [2009]; *People v Kisoon*, 8 NY3d 129, 135 [2007]; *People v O'Rama*, 78 NY2d 270, 279 [1991]). However, some jury-related errors are subject to a harmless error analysis, such as *Sandoval* violations (*see People v Grant*, 7 NY3d 421, 424 [2006]), failing to swear jurors immediately upon their selection rather that just before preliminary instructions (*see People v Quinones*, 18 AD3d 330, 331 [2005]), revealing the defendant in shackles to the jury (*see People v Clyde*, 18 NY3d 145, 148 [2011]), and making mistakes in substantively charging the jury (*see e.g. People v Robinson*, 1 AD3d 985, 986-987 [2003]). Here, the County Court's error did not prejudice or impede a thorough and fair voir dire of the veniremembers, the presentation of evidence, defenses, or proper jury charges, or the arguments of counsel.

I disagree with the defendants' argument in their reply brief that the failure to disclose the jurors' identities is a "mode of proceedings" error that requires reversal of the convictions regardless of issues of preservation or other circumstances. Not every procedural misstep is a mode of proceedings error, as the term is reserved for only the most fundamental of trial flaws (*see People v Mack*, 27 NY3d 534, 540-541 [2016], citing *People v Becoats*, 17 NY3d 643, 651 [2011]). Mode of proceedings errors are limited to situations when a court acts outside of its

jurisdiction, or deprives a party of a jury trial, or "where there was a fundamental, nonwaivable defect in the mode of procedure" (*People v Patterson*, 39 NY2d 288, 295 [1976], *affd* 432 US 197 [1977]). In this case, the defendants were not deprived of any objectively articulable benefit and protection associated with the right to a trial by jury, including the jurors' participation in meaningful voir dires, their acceptance of the requisite oaths, their attentiveness to the evidence presented and to the arguments of counsel, their understanding of the judge's rulings and charges, and their participation in a deliberative process resulting in the verdicts.

Fourth, on the issue of harmless error, the County Court mitigated its error by ultimately agreeing to retain the jurors' names for the defendants' counsels so that they could contact the jurors after the trial and determine whether any posttrial grounds existed on which to impeach the verdict. Either the defense counsels did not contact the jurors after the trial, or if they did, they obtained no information from which to impeach the verdicts, as the record reflects no motion by any defendant for posttrial relief on this issue under CPL 330.30 (2) or 440.10 (1) (f).[2]

Fifth, the various cases outside of New York that have considered the dual issues of anonymous juries and harmless error have each uniformly concluded, at federal and state levels, that error in the empanelment of an anonymous jury is subject to harmless error analysis (*see United States v Fernandez*, 526 Fed Appx 270 [4th Cir 2013]; *United States v White*, 698 F3d 1005 [7th Cir 2012]; *United States v Dinkins*, 691 F3d 358 [4th Cir 2012]; *United States v Morales*, 655 F3d 608 [7th Cir 2011]; *United States v Mansoori*, 304 F3d 635 [7th Cir 2002]; *United States v Sanchez*, 74 F3d 562 [5th Cir 1996]; *Wren v Fabian*, 2008 WL 4933950, 2008 US Dist LEXIS 92637 [D Minn, Nov. 14, 2008, No. 07-4353 (JNE/JSM)]; *State v Sundberg*, 349 Or 608, 247 P3d 1213 [2011]; *Major v State*, 873 NE2d 1120 [Ind Ct App 2007]; *State v Brown*, 280 Kan 65, 118 P3d 1273 [2005]; *State v Tucker*, 259 Wis 2d 484, 657 NW2d 374 [2003]; *State v Kelly*, 263 Or App 361, 328 P3d 757 [2014]). Conversely, no other court has held, as do my colleagues here, that issues involving anonymous juries are ineligible for harmless error analysis. The majority's holding that harmless error

---

**2.** Defendant Aguilar apparently made a postverdict CPL 330.30 motion on unrelated grounds.

cannot be applied here is an outlier contrary to the weight of national judicial opinion.

My colleagues in the majority favor a reversal of the instant convictions on the ground that the causal effect of the CPL 270.15 error is of such significance that it cannot lend itself to a harmless error analysis, as it undermines the self-standing right to a fair trial. At the same time, however, they concede that the effect of the error is not even knowable. Notably, cases where trial error has been incurable under harmless error analysis involve errors where prejudice to the defendant is knowable, articulable, or contrary to fundamental constitutional rights. Here, the significance of the CPL 270.15 error is, at best, speculative and, according to certain federal and state decisional authority, not even constitutional in nature. I respectfully disagree with my colleagues that harmless error should be inapplicable where, as here, the statutory violation does not involve any definite or ascertainable harm arising from, for example, the screening of jurors, the persuasiveness of attorney argument, the admissibility, sufficiency, and weight of the evidence, the propriety of jury instructions, or the deliberative process of the jury, but instead involves only conjecture and speculation. Further, I note the incongruity that would result if our Court were to conclude that a CPL 270.15 error was of such magnitude as to be beyond harmless error analysis, while at the same time, the federal court system and some of our sister states have well-developed rules for the use and management of anonymous juries and apply harmless error analysis to violations of those rules.

Accordingly, under the circumstances of this case, the County Court providently exercised its discretion in shielding from disclosure to the defendants the addresses of the jurors. I also conclude that while the court erred in not disclosing during jury selection and trial the actual names of the jurors, and in not disclosing address information to counsel during voir dire, such error was harmless.

I suggest that if the state legislature deems it proper, it should further examine the extent to which the discretionary authority of trial courts under CPL 270.15 (1-a) to withhold juror information reflects current and appropriate concern for jurors' safety in cases that may involve jury bribery, tampering, harassment, or physical harm, particularly in light of the electronic search technology that has developed since the enactment of CPL 270.15 (1-a) in 1983. Persons' lives and physical

safety may truly be at stake. Until such time that CPL 270.15 (1-a) is amended, if at all, trial judges must adhere to the statutory provisions and not issue protective orders as to any juror information other than, at most, their business and residential addresses.

Since I vote to affirm the judgments of conviction, a brief discussion is warranted as to the remaining issues raised on the appeals.

III. Legal Sufficiency and Weight of the Evidence

I agree with the majority that the defendants' challenges to the legal sufficiency of the evidence were unpreserved for appellate review (see CPL 470.05 [2]; People v Kolupa, 13 NY3d 786 [2009]; People v Payne, 3 NY3d 266, 273 [2004]). I also agree with the majority that, in any event, viewing the evidence in the light most favorable to the prosecution (see People v Contes, 60 NY2d 620 [1983]), it was legally sufficient to establish the defendants' guilt beyond a reasonable doubt. Moreover, as discussed by the majority, the verdicts of guilt were not against the weight of the evidence (see People v Romero, 7 NY3d 633 [2006]).

IV. Suppression of Identification Testimony and Expert Testimony on Gang Culture

I agree with the majority that the hearing court properly denied that branch of Ramirez's omnibus motion which was to suppress identification testimony. I also agree with the majority that the defendants' contentions regarding the expert testimony presented at trial on gang culture in general and as to the specific customs and practices of rival gangs in the City of Newburgh, and regarding the qualifications of the People's witness as an expert in those areas, are partially unpreserved for appellate review and, in any event, without merit.

V. Excessive Sentence

The crimes of which each defendant was convicted involved coordination, weapons, violence, and apparent gang-related rivalry and animosity. The injuries sustained by Gonzalez included bone fractures, lacerations, stab wounds, and a punctured lung. None of the defendants expressed any remorse at the time of his sentence, as the defendants maintained their innocence despite overwhelming evidence of their guilt.

Ramirez was charged in 1997 for gang assault in the first degree and related charges, absconded from the jurisdiction, became the subject of a bench warrant, and lived in Iowa for 11

years until the charges were disposed of in New York as a misdemeanor. The sentences imposed here on the top count of gang assault in the first degree, which were seven years less than the maximum permissible (*see* Penal Law § 70.02 [1] [a]; [3] [a]) and less than what the People requested, were not excessive (*see People v Suitte*, 90 AD2d 80, 84 [1982]).

Aguilar received a sentence of imprisonment on his conviction of gang assault in the first degree that was two years longer than the sentences imposed on his codefendants for the same offense. However, Aguilar wielded the knife that was used to stab his victim in the chest and puncture a lung. The presentence report described Aguilar as a serious, violent, and deadly threat to the community. The sentence imposed on the top count was five years less than the maximum permissible sentence (*see* Penal Law § 70.02 [1] [a]; 3 [a]) and less than what the People requested. The sentences imposed upon Aguilar were not excessive (*see People v Suitte*, 90 AD2d 80 [1982]).

Similarly, the sentences imposed upon A. Flores and E. Flores were not excessive (*see id.* at 84).

The defendants' remaining contentions are without merit.

CHAMBERS and BARROS, JJ., concur with LEVENTHAL, J.; DILLON, J.P., dissents in a separate memorandum.

Ordered that the judgments are reversed, on the law, and a new trial is ordered.

---

On the Court's own motion, it is ordered that the People are granted leave to appeal to the Court of Appeals, if they be so advised, pursuant to CPLR 5602 (a) (1) (i) from the opinion and order of this Court reversing the judgments of the County Court, Orange County (Nicholas De Rosa, J.), rendered August 6, 2010, against the defendant Alex Flores, August 9, 2010, against the defendant Lucio Ramirez, and August 31, 2010, against the defendants Benigno Aguilar and Emmanuel Flores, respectively, and the following question is certified to the Court of Appeals: Was the opinion and order of this Court properly made? Questions of law have arisen which, in our opinion, ought to be reviewed by the Court of Appeals (*see* CPLR 5713).