**Electronically Filed
Supreme Court
SCWC-20-0000175
15-MAR-2023
08:14 AM
Dkt. 31 OP**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

STATE OF HAWAI'I,
Respondent/Plaintiff-Appellee,

vs.

BRANDON FETU LAFOGA and RANIER INES, also known as Schizo,
Petitioners/Defendants-Appellants.

SCWC-20-0000175

CERTIORARI FROM THE INTERMEDIATE COURT OF APPEALS
(CAAP-20-0000175, CAAP-20-0000589; CASE NO. 1PC161001176)

MARCH 15, 2023

RECKTENWALD, C.J., NAKAYAMA, McKENNA, AND EDDINS, JJ.,
AND WILSON, J., CONCURRING IN PART AND DISSENTING IN PART[1]

OPINION OF THE COURT BY EDDINS, J.

This case addresses (1) a constitutional challenge to a

jury selection process that identified prospective jurors by

---

[1]    At the time of this opinion's publication, Justice Wilson's concurrence and dissent is forthcoming.

number, not name, and (2) a challenge to extended term sentencing jury instructions for attempted murder.

We affirm Brandon Lafoga and Ranier Ines' convictions.  But we remand for a new extended term sentencing hearing and resentencing.

## I.

The State alleged Brandon Lafoga and Ranier Ines committed several crimes.  It charged Lafoga with attempted murder in the second degree, conspiracy to commit murder in the second degree, carrying or use of firearm in the commission of a separate felony, kidnapping, and ownership or possession prohibited of any firearm or ammunition by a person convicted of certain crimes (felon in possession).  In the same indictment, the State charged Ines with accomplice to attempted murder in the second degree, conspiracy to commit murder, kidnapping, and robbery in the first degree.

On the eve of trial, after ruling on several motions in limine, the trial court decided to seat an innominate jury. Everyone would refer to prospective jurors by number, not name. The court told the parties it would conceal the prospective jurors' identifying information, including their names, phone numbers, and addresses.  Only the court would have that information.

Ines' counsel asked the court to clarify. Did the court intend to disclose the prospective jurors' names to defense counsel and the prosecution? The court did not. The prosecution objected. The deputy prosecuting attorney dubbed the process "dehumanizing." Ines' counsel agreed, adding that the attorneys needed the jurors' names to research information about the prospective jurors. Then, the prosecution asked why the court planned to deviate from the standard jury selection procedure. "I'm trying to head off a juror in this panel saying, I'm afraid to serve," the court explained. Ines' counsel repeated her concern: no names impaired jury selection preparation and execution. Counsel proposed that the attorneys receive the jurors' full names "but we both will not provide the list to our clients, but they will be present with us when we do jury selection."

After further discussion, the court indicated it would tell the jurors about the number system, but not why they'd be called numbers. The court aimed to "quell anxiety": "I have, in the past, had to inform jurors to quell anxiety, that there's been no incidents whatsoever. I do believe that's the situation here, but I don't want it to be raised in the entire panel's consciousness at all because we want them to serve."

Lafoga's counsel wondered about the process. Did the court mean the lawyers would not know the prospective jurors' names?

3

The court clarified its plan and explained the ground rules: the defense and prosecution (not the defendants and public) would know the names of the jurors, but not their addresses or phone numbers. Also, no one could say the jurors' names on the record.

After that, the attorneys raised no concerns. Defense counsel made no objection to keeping the jurors' names from the defendants. Later, right before jury selection began, the court asked if counsel objected to the number system. No one did.

During its introductory remarks, the court told the prospective jurors they would be identified by number. The court implied that this procedure protected the jurors' privacy.

> Ladies and gentlemen, when [the bailiff] did the initial roll call for this jury panel, each of you were given a card with your name on it along with your number. Please remember that number, that is your number, and for the rest of the proceedings in this case you will be addressed by that number. *Your actual names are known to the Court and to the attorneys, and other than a sealed list that will be kept for court records, no one else will know your actual names, so the public can't get your names and they cannot get your contact information*, so only court and counsel will have your names. For the rest of the proceedings you'll be addressed by your number.

(Emphasis added.)

Trial happened in November 2019. The jury found Lafoga guilty of attempted murder, use of firearm in a separate felony, kidnapping, and felon in possession of a firearm. Answering a special interrogatory, the jury found that the kidnapping count

merged with the attempted murder count, and later the court dismissed the kidnapping charge.

The jury found Ines guilty of accomplice to attempted murder, kidnapping, and robbery in the first degree. Answering a special interrogatory, the jury found that the kidnapping and robbery counts merged with the accomplice to attempted murder count, and later the court dismissed the kidnapping and robbery charges.

The verdicts did not end the jury's service. They remained for an extended term sentencing hearing. The jury had to decide whether extending Lafoga and Ines' ordinary statutory maximum sentences was "necessary for the protection of the public." HRS §§ 706-662 (2014), 706-664 (2014).

For each defendant's attempted murder convictions, the court gave an extended term jury instruction and posed a special interrogatory. The court's instructions and interrogatories conformed to the Hawai'i Standard Jury Instructions – Criminal.

Lafoga's instruction read in part:

> [T]he prosecution has alleged that BRANDON FETU LAFOGA is a persistent offender, a multiple offender, and that extended terms of imprisonment are necessary for the protection of the public. The prosecution has the burden of proving these allegations beyond a reasonable doubt. It is your duty to decide, in each count, whether the prosecution has done so by answering the following three essential questions on special interrogatory forms that will be provided to you:
>
> 1. Has the prosecution proved beyond a reasonable doubt that Defendant BRANDON FETU LAFOGA is a persistent offender in that he has previously been convicted of two or more

5

> felonies committed at different times when he was eighteen years of age or older?
>
> 2.   Has the prosecution proved beyond a reasonable doubt that Defendant BRANDON FETU LAFOGA is a multiple offender in that he is being sentenced for two or more felonies?
>
> 3.   Has the prosecution proved beyond a reasonable doubt that it is necessary for the protection of the public to extend the sentences for Defendant BRANDON FETU LAFOGA in Count 2 [Attempted Murder] *from a possible life term of imprisonment to a definite life term of imprisonment . . .* ?

(Emphasis added.)   The court's companion special interrogatory read in part: "Has the prosecution proved beyond a reasonable doubt that it is necessary for the protection of the public to extend the sentence in Count 2 for Defendant BRANDON FETU LAFOGA from *a possible life term of imprisonment to a definite life term of imprisonment*?"   (Emphasis added.)

Ines' extended term jury instruction mostly tracked Lafoga's, reading in part:

> [T]he prosecution has alleged that RANIER INES is a persistent offender and that extended terms of imprisonment are necessary for the protection of the public.  The prosecution has the burden of proving these allegations beyond a reasonable doubt.  It is your duty to decide, in each count, whether the prosecution has done so by answering the following two essential questions on special interrogatory forms that will be provided to you:
>
> 1. Has the prosecution proved beyond a reasonable doubt that Defendant RANIER INES is a persistent offender in that he has previously been convicted of two or more felonies committed at different times when he was eighteen years of age or older?
>
> 2. Has the prosecution proved beyond a reasonable doubt that it is necessary for the protection of the public to extend the sentences for Defendant RANIER INES in Count 1 [Accomplice to Attempted Murder] *from a possible life term of imprisonment to a definite life term of imprisonment . . .* ?

6

(Emphasis added.) Ines' special interrogatory asked the jury about his accomplice to attempted murder conviction, in part: "Has the prosecution proved beyond a reasonable doubt that it is necessary for the protection of the public to extend the sentence in Count 1 for Defendant RANIER INES from *a possible life term of imprisonment to a definite life term of imprisonment*?" (Emphasis added.)

The defendants had objected to those instructions and special interrogatories. The word "possible" could mislead the jury into thinking that there would not be a *life* term of imprisonment unless they received an extended life term of imprisonment, the defendants insisted.

The jury found the State had proven the extended term sentencing elements for Lafoga's attempted murder conviction; same for Ines' accomplice to attempted murder conviction.

Now eligible for the extended life without the possibility of parole term, the defendants faced sentencing. HRS § 706-661 (2014). The court sentenced Lafoga to an extended term of life without parole for attempted murder. Because the jury made extended term findings for Lafoga's two other convictions, the court increased his imprisonment to life with the possibility of parole for use of firearm in a separate felony, and a twenty-year term with the possibility of parole for felon in

7

possession.  On appeal, Lafoga only challenges the extended term jury instructions for the attempted murder conviction.

As for Ines, the court sentenced him to an extended term of life without parole for his accomplice to attempted murder conviction.

The defendants appealed.  They each raised four points of error.  The Intermediate Court of Appeals consolidated their appeals.  In a published opinion, the ICA affirmed Lafoga and Ines' convictions.

Both Lafoga and Ines petitioned for certiorari.  We accepted cert, and per Hawai'i Rules of Appellate Procedure Rule 40.1, limited the scope of our review to two issues: the jury selection issue and the jury instructions issue.

**II.**

Lafoga and Ines argue that the circuit court empaneled an anonymous jury.  They maintain the court's jury selection method violated their constitutional right to a presumption of innocence and an impartial jury.

We disagree.  There was no constitutional violation.

First, we discuss the defendants' claim that their jury was anonymous or "partially anonymous."  It was not.

With an anonymous jury, defense counsel and the prosecution do not know the prospective jurors' names.  "[O]ne necessary component" of an anonymous jury is that the jurors' names are

8

withheld from the attorneys and parties.  United States v. Harris, 763 F.3d 881, 885-86 (7th Cir. 2014); United States v. Ross, 33 F.3d 1507, 1521 n.27 (11th Cir. 1994) (describing an anonymous jury as one where the jurors' names and information are concealed from the public, lawyers, and defendants); see also Abraham Abramovsky & Jonathan I. Edelstein, Anonymous Juries: In Exigent Circumstances Only, 13 St. John's J. Legal Comment. 457, 457-58 (1999) (identifying United States v. Barnes, 604 F.2d 121 (2nd Cir. 1979), where a New York federal district court in 1977 kept secret the jurors' names and addresses in an organized crime trial, as the first "anonymous" jury trial in state or federal courts.).

Nor was the jury a "partially anonymous" jury.  See State v. Samonte, 83 Hawai'i 507, 928 P.2d 1 (1996) (trial court ordered that the first names, street addresses, and phone numbers of prospective jurors and their spouses be redacted from juror-information cards, and thereby empaneled a "partially anonymous jury.").  Because Lafoga's and Ines' counsel and the prosecution knew the full names of the prospective jurors, the jury was not a completely or partially anonymous jury.

This case's jury is better described as a confidential jury.  A confidential jury withholds a juror's name from the public, but not the parties.  See Harris, 763 F.3d at 885-86 (distinguishing between a confidential jury, where jury

information is available to the parties but not the public, and an anonymous jury, where the information is withheld from both the public and the parties). A confidential jury mainly concerns the public's First Amendment right to access trial proceedings, not the parties' right to the jurors' information. See Oahu Publications Inc. v. Ahn, 133 Hawai'i 482, 495-96, 331 P.3d 460, 473-74 (2014) (balancing the public's First Amendment right to access judicial proceedings with the due process concerns of the parties); Harris, 763 F.3d at 886 (explaining that a confidential jury challenge "focuses on whether access to the courts has been properly denied.").

Lafoga and Ines do not raise an access-to-the-courts challenge. Rather, their claims focus on the court's numbers system and its decision to keep the jurors' names from them.

An anonymous jury hobbles both sides. The defense and prosecution lose the ability to uncover useful information for jury selection and trial purposes. See United States v. Stone, No. CR 19-0018 (ABJ), 2020 WL 1892360, at *33 n.54 (D.D.C. Apr. 16, 2020) (quoting Nancy Gertner, Judith H. Mizner, & Joshua Dubin, The Law of Juries, Chapter 3 Section 3 at § 3.28, § 3.31, 10th ed. (2018) for the conclusions that "[t]he internet, and in particular social media . . . offers the possibility of a rich source of information about jurors that escapes the constraints of formal voir dire" and "[a]t the very minimum, pre-trial

investigation of potential jurors . . . can provide counsel with the justification for more probing voir dire questions . . . . And it can provide a direct basis for a cause challenge to a particular juror.").

But a confidential jury does not have this problem. With the potential jurors' names in hand, handy info is keystrokes away. See id. (citing Thaddeous Hoffmeister, Investigating Jurors in the Digital Age: One Click at a Time, 60 U. Kan. L. Rev. 611, 612 (2012) for the observation that "[t]he speed and ease by which information about jurors is now discovered online has led attorneys to increasingly investigate and research jurors. In fact, the practice has become fairly commonplace, with courts, practitioners, and state bar associations all approving and encouraging its use.").

Here, the defense and prosecution knew the prospective jurors' names. Before (and during) jury selection, the lawyers had a chance to learn more about these citizens. The court's method did not deprive the parties of information-gathering techniques, like online and social media research, that might discover helpful information to challenge a juror for cause, exercise a peremptory challenge, or tailor an argument. Lafoga and Ines fail to show how the circuit court prejudiced their ability to meaningfully conduct jury selection.

A confidential jury and an anonymous jury have their differences, but they also have a common feature: jurors are identified by number, not name. See State v. Sandoval, 788 N.W.2d 172, 194-95 (Neb. 2010) ("numbers jury" empaneled when the court identified potential jurors by number, and counsel, but not the defendant, knew their names).

A numbers jury may undermine the presumption of innocence. A person called a number may think their anonymity is necessary to protect them or someone else from a dangerous person - the defendant. See Samonte, 83 Hawai'i at 519, 928 P.2d at 12-13 ("An anonymous jury raises the specter that the defendant is a dangerous person from whom the jurors must be protected, thereby implicating the defendant's constitutional right to a presumption of innocence.").

A numbers jury is drastic. Trial courts should sparingly use this jury selection method. Evidence has to support an innominate jury. For a fully anonymous, partially anonymous, or confidential jury, a trial court must detail a "strong reason" the jury or jury system needs protection and make clear, evidence-based findings to support the conclusion. Then, the court must take reasonable precautions to minimize prejudice to the defendant. Id. at 520, 928 P.2d at 14. Reasonable measures to minimize prejudice include an example suggested by Samonte: "a plausible and nonprejudicial reason for not disclosing [the

12

jurors'] identities . . . (e.g., the trial court could instruct the jurors that the purpose for juror anonymity is to protect the jurors from contacts by the news media, thereby implying that juror anonymity is not the result of threats from the criminal defendant)." Id. at 522, 928 P.2d at 16.

Here, the trial court used Samonte's media-centered alternative reason to explain the confidential jury method. The trial court told prospective jurors: "Your actual names are known to the Court and to the attorneys, and other than a sealed list that will be kept for court records, no one else will know your actual names, so the public can't get your names and they cannot get your contact information." Later, the court advised the seated jury:

> Ladies and gentlemen, also, as we continue through this trial, you are going to be referred to by your juror number as well as your chair number. Your names are not made part of the public record of this case. You already see that there is a camera here in the courtroom. While they are permitted to cover the proceedings, the press is not allowed to have any likeness of yours, so they can't take any pictures of you, they cannot take any video of you, they cannot depict the jury in this case. So in addition to your names, your likeness will not be made part of the public record or available to the public in any way in this case.

There may be some naivete surrounding a court-crafted plausible reason. Jurors may not buy it. And this has the potential to erode the court's integrity. For this reason and the chipping of the presumption of innocence that comes from seating an anonymous or confidential jury, we disfavor a jury

13

selection process that uses numbers, not names, to identify prospective jurors.

Here, we conclude there was no strong, evidence-rooted reason to empanel a confidential jury. The court's hunch that some jurors might say they are "afraid to serve" does not support a confidential jury. The presumption of innocence doesn't take a backseat to abstract notions. The court should've handled this jury selection like any trial: a juror who expresses a fearful outlook that impairs impartiality will get excused for cause. Accordingly, unless there is evidence supporting a strong reason to have a numbers jury, see Samonte, 83 Hawai'i at 520-21, 928 P.2d at 14-15 (jury tampering), the normal jury selection process should unfold with the jurors addressed by their names.

We turn to something undetected by trial counsel. The parties and court overlooked HRS § 612-18(c) (Supp. 2014), which provides that the names of prospective jurors and the "contents of [their] juror qualification forms . . . shall be made available to the litigants concerned." (On appeal, Ines mentioned the law as part of his Samonte analysis). Learning information from the juror qualification forms, however, is not an absolute right. Because the law's language is directory; it can be disregarded if necessary to protect the safety of the jury or the integrity of the jury system. Id. 83 Hawai'i at 523,

928 P.2d at 17 (determining that the "shall" in HRS § 612-18(c) is directory, not mandatory). Still, there must be a strong reason to dodge HRS § 612-18, and per above, the court lacked one.

But the trial court's failure to adhere to HRS § 612-18(c) or provide a strong reason for the confidential jury selection process, does not alone make the defendants' trial constitutionally unfair. Defense counsel did not object to the court's jury selection method. But even if they did, the court's error did not impact Lafoga and Ines' constitutional rights. See State v. Mundon, 121 Hawaiʻi 339, 368, 219 P.3d 1126, 1155 (2009) (providing that when there is no reasonable possibility that a trial court's error contributed to a defendant's conviction, the error is "harmless beyond a reasonable doubt.").

Neither Lafoga nor Ines point to anything that shows how the court's jury selection method prejudiced them. And our examination of the record does not show that the defendants were prejudiced. Before jury selection the lawyers had a chance to gather helpful information. During jury selection the lawyers engaged the prospective jurors and learned things about their backgrounds and attitudes. Defense counsel rejected jurors, exercising most of their twelve peremptory challenges and waiving the rest. Lafoga and Ines sat next to defense counsel

15

throughout jury selection.  Though they did not know the jurors'
names, the defendants saw and heard the prospective jurors.
Nothing in the record suggests the defendants were unable to
meaningfully participate and aid counsel during jury selection.

The trial was constitutionally sound, and we affirm the ICA
in this respect.

### III.

The convictions stand.  But the defendants' life without
the possibility of parole sentences do not.

For the defendants' attempted murder convictions, we hold
that the court's extended term sentencing jury instructions and
special interrogatories were prejudicially erroneous and
misleading.

Under HRS § 706-662, a defendant convicted of a felony "may
be subject to an extended term of imprisonment" if a jury finds
beyond a reasonable doubt that the extended term is "necessary
for the protection of the public" and the defendant satisfies
certain criteria, like being a "persistent offender."

Lafoga and Ines concede they were persistent offenders.
Their challenge focuses on the jury's "necessary for the
protection of the public" finding for their attempted murder
convictions.  The two argue the court's extended term jury
instruction and special interrogatory confused and misled the
jury.

Lafoga's extended term jury instruction queried:

> Has the prosecution proved beyond a reasonable doubt that it is necessary for the protection of the public to extend the sentences for Defendant BRANDON FETU LAFOGA in Count 2 [Attempted Murder] *from a possible life term of imprisonment to a definite life term of imprisonment . . . ?*

(Emphasis added.)  Likewise, Lafoga's special interrogatory asked, in part: "Has the prosecution proved beyond a reasonable doubt that it is necessary for the protection of the public to extend the sentence in Count 2 for Defendant BRANDON FETU LAFOGA from *a possible life term of imprisonment to a definite life term of imprisonment*?"  (Emphasis added.)

Ines' extended term jury instruction similarly queried:

> 2. Has the prosecution proved beyond a reasonable doubt that it is necessary for the protection of the public to extend the sentences for Defendant RANIER INES in Count 1 [Accomplice to Attempted Murder] *from a possible life term of imprisonment to a definite life term of imprisonment . . . ?*

(Emphasis added.)  And Ines' special interrogatory asked, in part: "Has the prosecution proved beyond a reasonable doubt that it is necessary for the protection of the public to extend the sentence in Count 1 for Defendant RANIER INES from *a possible life term of imprisonment to a definite life term of imprisonment*?"  (Emphasis added.)

The defendants maintain that "possible life term of imprisonment" portends a "less-than-life sentence."  A "possible life term of imprisonment" compared to a "definite life term of imprisonment" indicates that they will possibly get a sentence

17

shorter than life.  The word "possible" may spur the jury to select the harsher option, they say.  Lafoga and Ines argue the jury instructions did not properly convey the options.  A "possible" life term, meant they were going to get a life term – not something less than life - regardless of the jury's answer to the interrogatory.

The State counters that the extended term sentencing jury instructions and special interrogatories were fine.  They came from State v. Keohokapu and tracked the Hawai'i Standard Jury Instructions – Criminal (HAWJIC).  See, e.g., HAWJIC 19.3.1A. Persistent Offender: H.R.S. § 706-662(1) (asking whether "the prosecution proved beyond a reasonable doubt that it is necessary for the protection of the public to extend the Defendant's sentence from a . . . possible life term of imprisonment" to a "definite life term of imprisonment").

The ICA sided with the State, holding that "[t]he extended term jury instruction for both defendants was not erroneous under State v. Keohokapu."  127 Hawai'i 91, 276 P.3d 660 (2012). It stressed that the jury instructions were similar to an instruction suggested in a footnote by the Keohokapu majority and identical to the standard jury instructions.  The ICA pointed out that Keohokapu advised: "[t]o determine whether an extended term of imprisonment is necessary for the protection of the public, . . . the jury should not be instructed about the

18

procedures of the Hawai'i Paroling Authority, or that the sentence includes the possibility of parole."

We clarify Keohokapu and straighten our case law to align with the statutory language of Hawai'i's extended term sentencing laws.

To start, we discuss Keohokapu.  The jury found the defendant guilty of manslaughter, a class A felony offense with an "indeterminate term of imprisonment of twenty years without the possibility of suspense of sentence or probation."  HRS § 706-659 (2014).  The State moved for extended term sentencing.  Per HRS § 706-664, the Sixth Amendment, and article I section 14 of the Hawai'i Constitution, a jury finding is required to make a defendant eligible for a sentence exceeding the ordinary statutory maximum.  Apprendi v. New Jersey, 530 U.S. 466, 494 (2000); Flubacher v. State, 142 Hawai'i 109, 118-19, 414 P.3d 161, 170-71 (2018).  Thus, the trial court asked Keohokapu's jury: "Has the prosecution proven beyond a reasonable doubt that it is necessary for the protection of the public to subject [Keohokapu] to an extended term of imprisonment, which would extend the maximum length of his imprisonment for the offense of Manslaughter from twenty years of incarceration to life with the possibility of parole?"  Keohokapu, 127 Hawai'i at 100 n.16, 276 P.3d at 669 n.16.  The court also gave instructions that defined "indeterminate term of imprisonment" and discussed many aspects

19

of "parole."  It rejected long defense instructions about parole procedures and processes.  Id. at 99-100, 276 P.3d at 668-69.

Keohokapu addressed a discrete question: "Whether the ICA gravely erred by determining that no error occurred when the trial court instructed the jury on the irrelevant issues of parole and the role of the Hawai'i Paroling Authority during the extended term phase of trial?"  Id. at 101, 276 P3d at 670.  Both the majority and dissent endorsed instructions that sidestepped explanations about parole roles, procedures, and processes.  See Keohokapu, 127 Hawai'i at 116, 276 P.3d at 685. (Recktenwald, C.J., dissenting in part) (agreeing with the majority that "additional information about how the parole process works . . . was not required by the statute").

But the dissent critiqued the majority's reluctance to mention or even use the word "parole" in extended term jury instructions.  It spotlighted a flaw with the majority's framework: the majority failed to account for a jury decision after a second-degree murder conviction; that is, whether the defendant should receive an extended term of life without parole, rather than a sentence of life with the possibility of parole.  Id. at 123-24, 276 P.3d 692-93.  Pointing to HRS § 706-661, the dissent explained that a jury could not meaningfully choose between those two sentences without knowing about parole and "[t]hus the legislature clearly contemplated that juries

20

would not be shielded from the fact that parole is available."
Id. at 116, 276 P.3d at 685.

The Keohokapu majority, in response, recommended an
extended term sentencing instruction for a second-degree murder
case: "instruct the jury to consider whether the defendant's
sentence should be extended from possible life imprisonment to a
definite (or fixed) sentence of life imprisonment."  Id. at 112
n.33, 276 P.3d at 681 n.33.

The ICA used this footnote, and the HAWJIC standard jury
instructions it inspired, to support upholding the trial court's
instructions in Lafoga and Ines' case.

Because now the conceptual discussion in Keohokapu has real
controversy, we clarify that a jury considering extended term
sentencing for second-degree murder must determine whether the
prosecution has proved beyond a reasonable doubt that it is
necessary for the protection of the public to extend a sentence
from life with the possibility of parole to life without the
possibility of parole.  A few reasons guide our holding.

First, the legislature was clear.  HRS §§ 706-662 and 706-
664 set forth the criteria and procedures for extended term
sentencing, and HRS § 706-661 specifies the "length" of an
extended sentence.  If it is "necessary for the protection of
the public," then a person convicted of second-degree murder may
be sentenced to "life without the possibility of parole."  HRS

§ 706-661.  The legislature's extended term sentencing laws contemplate that the jury will decide whether a person is eligible for a sentence of life without the possibility of parole or life with the possibility of parole.  And, by extension, the jury will consider the word "parole."

No evidence or jury instructions describing parole matters are needed for the jury to consider the difference between life *with* and life *without* parole.  Keohokapu's holding is satisfied in this respect.  "Parole" is all the jury needs to hear.  The jury inquiry depends on the word "parole" but does not depend on the nuances of parole.

A jury navigates complex words and concepts.  The collective wisdom of twelve citizens is a defining virtue of America's jury trial system.  We believe jurors will use their common understanding and knowledge to grasp what "parole" means for purposes of extended term sentencing.  Cf. State v. David, 149 Hawaiʻi 469, 475-76, 494 P.3d 1202, 1208-09 (2021) (providing that blood alcohol levels and the association between excessive alcohol consumption and aggression are within the common knowledge and experience of ordinary jurors).  That is, "life with the possibility of parole" means the defendant may someday get out of prison.  And "life without the possibility of parole" means the defendant will never get out of prison.  So there is no reason to define or explain "parole."

Second, a jury can only make a reasoned sentencing decision after a murder conviction if it knows about the parole option. The possibility of parole is the *only* difference between an extended sentence and an ordinary sentence for second-degree murder. To make its "necessary for the protection of the public" finding, the jury needs to know that difference. "There is no way that a jury could meaningfully make that decision without being informed of the difference between life with, and life without, the possibility of parole." Keohokapu, 127 Hawai'i at 116, 276 P.3d at 685. (Recktenwald, C.J., dissenting in part).

Third, the Keohokapu footnote understates the ordinary statutory maximum for murder. A "possible life term of imprisonment" compared to a "definite life term of imprisonment" suggests that a defendant will *possibly* get a sentence *less* than life. At least one of twelve jurors may interpret a "possible life term of imprisonment" to mean a defendant *might* get a life sentence *or* they might get less than a life sentence. A juror believing the latter may find the extended sentence is necessary because of a misplaced belief that the defendant would otherwise not receive a "life" sentence. As Lafoga's trial attorney put it:

> [T]he phrase possible life term of imprisonment could leave
> the jury to think that there's not going to be a life term
> of imprisonment. If the jury is led to believe that
> there's not going to be a life term of imprisonment, then

23

> it's -- it's more likely that they will say that an
> extended term is necessary for the protection of the
> public.

The Keohokapu dissent foresaw confusion and prejudice: "An interrogatory phrased in the manner suggested by the majority could lead a jury to reasonably infer that a sentence of 'life' means exactly what it says, e.g., that the defendant will remain imprisoned for the remainder of [their] life.  However, that inference would not necessarily be accurate, because a defendant such as Keohokapu would be eligible for parole."  Keohokapu, 127 Hawai'i at 123, 276 P.3d at 692.

Here, we hold the extended term sentencing instructions and special interrogatories were prejudicially erroneous and misleading.  Stanley v. State, 148 Hawai'i 489, 500-01, 479 P.3d 107, 118-19 (2021).  We remand for resentencing on the defendants' extended term sentences for attempted murder, and rule that this opinion only applies to Lafoga and Ines and cases that are on direct review or not yet final.  See Lewi v. State, 145 Hawai'i 333, 349 n.21, 452 P.3d 330, 346 n.21 (2019).

**IV.**

This case is remanded for a new extended term sentencing hearing and resentencing.  In all other respects the ICA's June 20, 2022 judgment on appeal, the circuit court's February 20, 2020 judgment of conviction and sentence for Lafoga, and the

24

circuit court's September 2, 2020 amended judgment of conviction and sentence for Ines are affirmed.

| | |
|---|---|
| William Li<br>for petitioner Brandon Fetu<br>Lafoga | /s/ Mark E. Recktenwald |
| | /s/ Paula A. Nakayama |
| | /s/ Sabrina S. McKenna |
| Kai Lawrence<br>for petitioner Ranier Ines | /s/ Todd W. Eddins |
| Stephen K. Tsushima<br>for respondent | |

