People v Goberdhan (2025 NY Slip Op 04601)

People v Goberdhan

2025 NY Slip Op 04601

Decided on August 7, 2025

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:August 7, 2025

113595
[*1]The People of the State of New York, Respondent,
v
Ishwarnand Goberdhan, Also Known as Kriso, Appellant.

Calendar Date:April 22, 2025

Before:Garry, P.J., Clark, Pritzker, McShan and Powers, JJ.

Steven M. Sharp, Albany, for appellant.
Robert M. Carney, District Attorney, Schenectady (Peter H. Willis of counsel), for respondent.

Powers, J.
Appeal from a judgment of the County Court of Schenectady County (Matthew Sypniewski, J.), rendered April 28, 2022, upon a verdict convicting defendant of the crimes of murder in the second degree and leaving the scene of an incident without reporting.
In February 2020, defendant was charged by indictment with two counts of murder in the second degree, manslaughter in the first degree and leaving the scene of an incident without reporting a personal injury, where the personal injury resulted in death. These charges stemmed from an incident occurring on a night in December 2019, during which
defendant struck the victim multiple times with his vehicle resulting in the victim's death. Following a jury trial, defendant was found guilty of one count of murder in the second degree and leaving the scene of an incident without reporting.[FN1] The count of murder in the second degree, as charged in count 2 of the indictment, alleging that defendant was acting with depraved indifference to human life, was dismissed on consent prior to submission to the jury. Upon defendant's request, the charge of manslaughter in the first degree, as charged in count 3 of the indictment, together with manslaughter in the second degree were submitted to the jury as lesser included offenses of the remaining charge of murder in the second degree. Defendant was sentenced to a prison term of 25 years to life on the murder conviction and to a consecutive prison term of 2⅓ to 7 years on the leaving the scene conviction. Defendant appeals.
We turn first to defendant's legal sufficiency and weight of the evidence contentions. Defendant raised various arguments as to the sufficiency of evidence at the close of the People's proof; however, his failure to renew those objections at the close of his case-in-chief renders his arguments unpreserved (see People v Hodge, 224 AD3d 1082, 1083 [3d Dept 2024], lv denied 41 NY3d 1002 [2024]; People v Colvin, 218 AD3d 1016, 1017 [3d Dept 2023], lv denied 40 NY3d 1038 [2023]). "Nevertheless, in reviewing whether the verdict is against the weight of the evidence, this Court necessarily must ensure that the People proved each element of the crime[s] beyond a reasonable doubt. In conducting such a review, where an acquittal would not have been unreasonable, we view the evidence in a neutral light and, while giving deference to the jury's credibility determinations, weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony" (People v Lozano, 203 AD3d 1231, 1232 [3d Dept 2022] [internal quotation marks and citations omitted]; see People v Starnes, 206 AD3d 1133, 1135 [3d Dept 2022], lv denied 38 NY3d 1153 [2022]).
The evidence elicited at trial established that, on the night in question, the victim had been using crack cocaine and, after exhausting his supply, ventured out to secure money to obtain more of that drug. Meanwhile, defendant was working at a local bar [*2]and, at around 3:00 a.m., he exited the establishment and sat in his vehicle. Surveillance footage from several area businesses depicted this sequence of events, showing defendant sitting in his vehicle until around 3:30 a.m., when the victim first approached the driver side window of defendant's vehicle. According to defendant's grand jury testimony, which was admitted at trial, the victim asked for money to buy food. As defendant opened his wallet, which by his account contained over $1,500, the victim grabbed the wallet and ran. The surveillance footage shows the victim fleeing on the street and defendant pursuing him in his vehicle. The chase culminated in a nearby parking lot, where the video footage shows defendant hitting the victim with his vehicle and knocking the victim to the ground. The victim then got up and began to run again and, while running close to the wall of a neighboring establishment, defendant struck the victim a second time, momentarily pinning him to the wall. After freeing himself, the victim continued running and defendant pursued him further into the parking lot with his vehicle to a location out of view of the cameras. Although the footage does not depict the end of the incident, the engine of defendant's vehicle could be heard revving before briefly stopping. The vehicle then reversed into frame. According to defendant's testimony before the grand jury, he could not see the victim at this point during the pursuit, so he backed his vehicle up and exited his vehicle. Defendant indicated that he did not feel a person under the vehicle during the incident. After exiting his vehicle, defendant saw the victim on the ground and asked for his wallet. Defendant then saw his wallet a few feet away and retrieved it, left the parking lot in his vehicle and drove home. Surveillance footage shows that defendant returned to the scene later in a different vehicle. Defendant acknowledged having done so, stating that he returned to check on the victim, but he left after he did not see the victim in the parking lot. The trial evidence demonstrated that the victim's body, discovered by a passerby several hours later, was in the same location in the parking lot where defendant had chased the victim before going off frame.
The People introduced expert testimony and a report from Michael Sikirica, a board-certified forensic pathologist, who performed the autopsy on the victim. According to Sikirica, the victim had a "frog leg" appearance which was explained by fractures to his pelvis, among other places, revealed by X-ray. Sikirica noted that there were small bits of gravel and stone imbedded in the tissue of the victim's abdomen. Abrasions were also present on the inside portion of the victim's right thigh which, according to Sikirica, were caused by an object coming across the thigh, and abrasions were present on the left thigh, which were covered with ground-in dirt. X-rays revealed that fractures were present on every one of the victim's [*3]ribs, his sternum and his spine. The broken ribs resulted in lacerations to the lung. Sikirica also observed tears to the liver and lacerations to the heart, which he opined are indicative of blunt force compressive trauma. Sikirica concluded that the victim suffered at least three lethal injuries — primarily, the lacerations to the heart and aorta — and would have fallen unconscious within a few seconds of sustaining the injuries and then died relatively quickly thereafter. Sikirica ruled the victim's manner of death to be homicide based on a review of the footage noting, however, that the strikes depicted on footage were not the cause of the fatal injuries. To that end, Sikirica noted that the cause of death was severe compressive blunt force injuries, indicative of being crushed, which took place out of the various viewpoints of the cameras.
Defendant's case-in-chief consisted of the testimony of a state trooper who was assigned to the collision reconstruction unit. The trooper analyzed the surveillance videos in this case, which depicted the victim running while being chased by a vehicle, and then the pedestrian changing directions into the vehicle's line and the vehicle's brake lights illuminating before the first strike. She ultimately opined, however, that the "primary cause of this incident is the intentional action of the operator of [the] vehicle . . . twice striking and then running over [the victim]." Defendant, testifying in his own defense, explained that, throughout the incident, he was scared and upset because his wallet contained, in addition to a substantial amount of money, various important family documents. To that end, he testified that he began to cry during the pursuit, and he could not see the victim because his vision was clouded by his tears. Defendant initially noted that he did not recall the initial impact with the victim but conceded that, during the second impact, he was aware that he had hit the victim while intending to block him from continuing to run. Defendant testified that he did not observe any injuries on the victim when he got out of the vehicle. Defendant also acknowledged that he did not call emergency services or otherwise report the incident because he was nervous.
Defendant's argument on appeal as to his conviction of murder in the second degree is predicated on his assertion that the evidence failed to demonstrate his intent to cause the victim's death (see Penal Law § 125.25 [1]). Acquittal would not have been unreasonable based upon defendant's testimony that, although he was driving the vehicle that struck the victim, he only intended to block the victim but he could not see because his vision was clouded by tears, as well as the testimony of the state trooper, who had indicated in her report that, among other things, defendant's brake lights flashed prior to the initial strike. However, the evidence that supported defendant's contention that he did not intend to kill the victim was placed squarely [*4]before the jury, who chose to reject it (see People v Dorvil, 234 AD3d 1106, 1111-1112 [3d Dept 2025]; People v Grady, 233 AD3d 1369, 1372 [3d Dept 2024], lv denied 43 NY3d 963 [2025]). Instead, the jury accepted the permissible inferences as to defendant's intent that could be gleaned from the video footage, which depicted defendant striking the victim twice and then pursuing him closely off frame, as well as the injuries to the victim as revealed by his autopsy which were consistent with being run over (see People v Callahan, 186 AD3d 943, 945 [3d Dept 2020]; see also People v Lewis, 224 AD3d 1143, 1147 [3d Dept 2024], lv denied 42 NY3d 939 [2024]). Accordingly, viewing the evidence in a neutral light and "deferring to the jury's credibility assessments, we reject defendant's assertion that the weight of the evidence failed to show that he possessed the requisite intent to kill the victim" (People v Callahan, 186 AD3d at 945; see People v Leppanen, 218 AD3d 995, 1001 [3d Dept 2023], lv denied 40 NY3d 1081 [2023]; People v Stanford, 130 AD3d 1306, 1308 [3d Dept 2015], lv denied 26 NY3d 1043 [2015]).
Defendant's contention that the People failed to establish the necessary elements relating to his conviction for leaving the scene of an incident resulting in death also lacks merit. As relevant here, "[a]ny person operating a motor vehicle who, knowing or having cause to know that personal injury has been caused to another person, due to an incident involving the motor vehicle operated by such person shall . . . stop" and provide certain identifying information to the injured individual and a police officer, if practical, and in the event that no police officer is in the vicinity, "shall report said incident as soon as physically able to the nearest police station or judicial officer" (Vehicle and Traffic Law § 600 [2] [a]). Defendant's contention essentially posits that the vehicle he was driving met the definition of a motor vehicle while he pursued the victim on the public road (see Vehicle and Traffic Law §§ 125, 134), but lost that status once it entered the private parking lot where the incident occurred. We reject that premise (see generally People v Cassata, 238 AD3d 1492, 1493-1494 [4th Dept 2025]; People v Lopez, 144 Misc 2d 325, 326-327 [Sup Ct, NY County 1989]), and further note that the statutory requirement to report an incident involving a motor vehicle causing personal injury that results in death contains no provision requiring that the incident have occurred on a public highway (see Vehicle and Traffic Law § 600 [2] [a]; People v Bell, 21 Misc 2d 578, 579 [Monroe County Ct 1960]). Accordingly, we find that a different verdict would have been unreasonable and, thus, defendant's conviction of leaving the scene of an incident without reporting is not against the weight of the evidence (see People v Papineau, 19 AD3d 1149, 1150 [4th Dept 2005]; see also People v Ferguson, 193 AD3d 1253, 1257 [3d Dept 2021], lv denied 37 NY3d 964 [2021]; [*5]People v Tromans, 177 AD3d 1103, 1105 [3d Dept 2019]).
Defendant's related argument that his conviction of leaving the scene was duplicitous is unpreserved (see People v Allen, 24 NY3d 441, 449-450 [2014]; People v Agan, 207 AD3d 861, 862 [3d Dept 2022], lvs denied 38 NY3d 1186 [2022], 39 NY3d 939 [2022]) and, nevertheless, we find it lacking in merit. Defendant does not challenge the validity of the charge in the indictment; rather, he asserts that the testimony he provided to the grand jury, and the evidence admitted during trial, established that he left the scene on two occasions: after the initial incident and subsequently, when he returned in a different vehicle (see People v Black, 65 AD3d 811, 813 [3d Dept 2009], lv denied 13 NY3d 905 [2009]). However, County Court clearly advised the jury that in order to find defendant guilty, the jury was required to find that defendant caused personal injury to the victim and, "before leaving the place where the said personal injury occurred," he failed to report the incident. Accordingly, it is evident that the jury's determination rested on the initial act of causing personal injury and the subsequent departure, the only sequence of acts that would have satisfied the criminal conduct proscribed in Vehicle and Traffic Law § 600 (2) (a) (see People v Delbrey, 179 AD3d 1292, 1297 [3d Dept 2020], lv denied 35 NY3d 969 [2020]).
Defendant next claims that a new trial is required on the basis that County Court utilized an anonymous jury (see generally People v Flores, 32 NY3d 1087, 1088 [2018]; People v Tenace, 229 AD3d 908, 911 [3d Dept 2024]; People v Heidrich, 226 AD3d 1096, 1098 [3d Dept 2024], lv denied 42 NY3d 927 [2024]). While defendant did not explicitly consent to the process utilized (compare People v Reinfurt, ___ AD3d ___ [3d Dept 2025] [decided herewith]), he also did not lodge any objection thereto, despite ample opportunity to do so. For this reason, as defendant inherently concedes, this claim is unpreserved for review by this Court (see CPL 470.05 [2]).
"A defendant cannot be permitted to sit idly by while error is committed, thereby allow[ing] the error to pass into the record uncured, and yet claim the error on appeal. Were the rule otherwise, the State's fundamental interest in enforcing its criminal law could be frustrated by delay and waste of time and resources invited by a defendant" (People v Patterson, 39 NY2d 288, 295 [1976], affd 432 US 197 [1977]). For this reason, with limited exceptions, this "Court does not consider claims of error not preserved by appropriate objection in the court of first instance" (People v Hanley, 20 NY3d 601, 604 [2013] [internal quotation marks and citation omitted]). However, "[a] defendant in a criminal case cannot waive, or even consent to, error that would affect the organization of the court or the mode of proceedings proscribed by law" (People v Patterson, 39 NY2d at 295). This is "a very narrow category of cases" where the claimed error "go[[*6]es] to the essential validity of the process and [is] so fundamental that the entire trial is irreparably tainted" (People v Kelly, 5 NY3d 116, 119-120 [2005]; see generally People v Gray, 86 NY2d 10, 21-22 [1995]). "Only fundamental defects in judicial proceedings, however, fall within this very narrow category of so-called 'mode of proceedings' errors" (People v Agramonte, 87 NY2d 765, 770 [1996] [citations omitted]).
Secondarily, irrespective of whether the claimed error constitutes a mode of proceedings error, this Court is empowered to reverse or modify the judgment "[a]s a matter of discretion in the interest of justice" (CPL 470.15 [3] [c]; see People v Tenace, 229 AD3d at 911). Although not restricted to this basis, "[t]he kinds of determinations of reversal or modification deemed to be made as a matter of discretion in the interest of justice include . . . [t]hat an error or defect occurring at a trial resulting in a judgment, which error or defect was not duly protested at trial as prescribed in [CPL 470.05 (2)] so as to present a question of law, deprived the defendant of a fair trial" (CPL 470.15 [6] [a]; see generally People v Swartz, 235 AD3d 1098, 1101 [3d Dept 2025]; People v McClenos, 172 AD3d 1638, 1640 [3d Dept 2019], lv denied 33 NY3d 1107 [2019]). There is no set standard for when the Court may invoke its interest of justice jurisdiction. Instead, it has been indicated that "the discretionary act to vacate a conviction in the interest of justice is to be exercised sparingly and only in that rare and unusual case where it cries out for fundamental justice beyond the confines of conventional considerations" (People v Williams, 145 AD3d 100, 107 [1st Dept 2016] [internal quotation marks and citation omitted]).
County Court did not state expressly on the record that it was going to refer to prospective jurors by the individual's assigned juror number and initials or provide any explanation, however brief, as to why it was doing so. Yet, prior to the start of jury selection, the court stated that counsel for both sides was familiar with the process it utilized for selection of the jury. Subsequently, when defendant's counsel stated that he did not yet have the list of prospective jurors, the court indicated that it did not either and that the Commissioner of Jurors "will bring that up for all of us" (emphasis added). After initial instructions from the court and the prospective jurors being sworn, the first group was brought forward for voir dire. In doing so, the court clerk randomly selected individuals and then referred to each by their assigned juror number and initials and, essential to defendant's argument, did not utilize full names. This process was repeated each time a new group was brought forward for voir dire. At no point did defendant object or indicate, even in passing, any issue with this process. Markedly, the court asked individuals who indicated that they had family in local law enforcement the full names of these [*7]individuals — which included children, nieces, nephews and cousins — signaling that prospective jurors' identities were not being shielded from defendant. Moreover, as voir dire progressed, both parties referred to the attendance list of prospective jurors, with defendant's counsel telling a prospective juror that his or her name was familiar, illustrating that this list had been provided to defendant.
Initially, contrary to defendant's assertion, we do not find the claimed error to fall within the narrow class of cases which constitute a mode of proceedings error. The act of calling an individual's full name when drawing from the pool of prospective jurors, although statutorily required (see CPL 270.15 [1] [a]), is ministerial in nature (see People v Stewart, 231 AD3d 1480, 1482 [4th Dept 2024], lv denied 42 NY3d 1054 [2024]; see also People v Jenne, 224 AD3d 953, 958 [3d Dept 2024], lv denied 42 NY3d 927 [2024]; People v Bostic, 217 AD3d 678, 681 [2d Dept 2023], lv denied 41 NY3d 964 [2024]). Moreover, counsel was "not prevented from objecting or from participating meaningfully" in jury selection because the identities of prospective jurors were known to the defense (People v Mack, 27 NY3d 534, 542 [2016]; see People v Allen, 232 AD3d 1256, 1257 [4th Dept 2024], lv denied 42 NY3d 1078 [2025]). Thus, the failure to call the full names of prospective jurors aloud, when those names are in fact known to the parties, does not "implicate any fundamental constitutional concerns that strike at the core of the criminal adjudicatory process" so as to constitute a mode of proceedings error (People v Hanley, 20 NY3d at 606; see People v Hebert, 218 AD3d 1003, 1014 [3d Dept 2023], lv denied 40 NY3d 1080 [2023]; see also People v Gonzalez, 214 AD3d 1439, 1440 [4th Dept 2023], lv denied 39 NY3d 1154 [2023]). Furthermore, we do not see this as one of the rare cases where invocation of this Court's interest of justice jurisdiction is warranted and, therefore, decline defendant's request to take corrective action (see People v McDaniel, 217 AD2d 859, 860 [3d Dept 1995], lv denied 87 NY2d 848 [1995]; People v King, 105 AD2d 1015, 1016 [3d Dept 1984]).
We find no error in County Court's denial of defendant's Batson challenge. "Batson outlines a three-step protocol to be applied when a defendant challenges the use of peremptory strikes during voir dire to exclude potential jurors for pretextual reasons. At step one, the movant must make a prima facie showing that the peremptory strike was used to discriminate; at step two, if that showing is made, the burden shifts to the opposing party to articulate a non-discriminatory reason for striking the juror; and finally, at step three, the trial court must determine, based on the arguments presented by the parties, whether the proffered reason for the peremptory strike was pretextual and whether the movant has shown purposeful discrimination" (People v Bridgeforth, 28 NY3d 567, 571 [2016] [citation omitted]; see People v [*8]Cruz, 228 AD3d 1019, 1020-1021 [3d Dept 2024]). "[A]ny issue with respect to the prima facie showing under step one was rendered moot by the prosecutor's provision of race-neutral reasons for the peremptory challenges," thus distilling this Court's inquiry to steps two and three (People v Morgan, 230 AD3d 864, 870 [3d Dept 2024], lv granted 42 NY3d 973 [2024]). In this regard, the "third-step inquiry is a pure issue of fact, and the trial court's determination whether a proffered race-neutral reason is pretextual is accorded great deference on appeal" (People v Hecker, 15 NY3d 625, 656 [2010] [internal quotation marks and citation omitted], cert denied 563 US 947 [2011]; see People v Kirkley, 172 AD3d 1541, 1545 [3d Dept 2019], lv denied 33 NY3d 1106 [2019]).
Defendant challenged the prosecutor's use of peremptory challenges on three prospective jurors — Nos. 270, 301 and 326 — on the basis that these strikes were racially motivated. Relevant here, prospective jurors Nos. 270 and 326 both have bachelor's degrees, with the latter individual's degree being in legal studies, whereas prospective juror No. 301 had not completed college. During voir dire, the prosecutor posed a question in which the victim of a crime was high on drugs, stole a wallet and was then murdered. When asked if this factual scenario would make the individual consider the murder to be something lesser, prospective juror No. 270 stated that there was "no excuse" for the perpetrator "to take it into their own hands." However, without further elaboration, this prospective juror also opined that drug use "may affect [the victim] mental[ly]."
County Court found that defendant had made a prima facie showing of discrimination and, therefore, sought a nondiscriminatory reason from the prosecutor for the use of peremptory challenges for these individuals. The prosecutor asserted that prospective juror No. 326 had a background in legal studies and, therefore, feared that this individual may act as an expert believing she knows more than she does. As it relates to prospective juror No. 270, the prosecutor took issue with the statement that seemed to place blame on the victim. Finally, the prosecutor stated that prospective juror No. 301 was not ideal because she was looking for someone with more education and, furthermore, this individual appeared to be inattentive during jury selection. Over defendant's objection, the court found that the prosecutor offered sufficient and valid nondiscriminatory reasons for striking these three prospective jurors. Deferring to County Court's factual findings and credibility determinations at step three of the Batson inquiry, we discern no basis to disturb the court's decision to credit the race-neutral reasons proffered by the People as nonpretextual (see People v Cruz, 238 AD3d 1327, 1328-1329 [3d Dept 2025]; People v Williams, 177 AD3d 1178, 1182 [3d Dept 2019], lv denied 34 NY3d 1164 [2020]).
We similarly find without merit defendant's assertion that [*9]County Court erred in denying his for-cause challenge to prospective juror No. 157 based upon her civilian employment with the State Police. When asked about her interactions with forensic lab employees, this prospective juror stated that they are in a different, adjacent building to where she works, and she has no contact with those employees. While she did reveal that she was familiar with one potential witness whom she had worked with years prior, she affirmed unequivocally that this familiarity would not impact her impartiality. Based upon this, we find that the court did not abuse its discretion in denying defendant's for-cause challenge as the record did not reveal that prospective juror No. 157 possessed a mindset that "[was] likely to preclude [her] from rendering an impartial verdict" as there were no answers the prospective juror gave that would indicate she could not be fair and impartial (CPL 270.20 [1] [b]; see People v Contompasis, 236 AD3d 138, 152 [3d Dept 2025], lv denied 43 NY3d 1007 [2025]; People v Alger, 206 AD3d 1049, 1053 [3d Dept 2022], lv denied 38 NY3d 1148 [2022]).
Defendant's argument that he did not receive the effective assistance of counsel is equally unpersuasive. Initially, defendant's claim that counsel was ineffective for permitting him to testify before the grand jury concerns matters outside the record and, thus, is properly raised in the context of a CPL article 440 motion (see People v Reynolds, ___ AD3d ___, ___, 2025 NY Slip Op 03607, *4 [3d Dept 2025]; cf. People v Dunbar, 218 AD3d 931, 933 [3d Dept 2023], lv denied 40 NY3d 950 [2023]). As to the balance of defendant's argument, "a claimed violation of the constitutional right to the effective assistance of counsel will not survive judicial scrutiny so long as the evidence, the law, and the circumstances of a particular case, viewed in totality and as of the time of the representation, reveal that the attorney provided meaningful representation" (People v Houze, 177 AD3d 1184, 1188-1189 [3d Dept 2019] [internal quotation marks, brackets and citations omitted], lv denied 34 NY3d 1159 [2020]; see People v Lopez, 226 AD3d 1165, 1166-1167 [3d Dept 2024], lv denied 42 NY3d 905 [2024]). Defendant must therefore "demonstrate the absence of strategic or other legitimate explanations . . . that would be consistent with the decisions of a reasonably competent attorney" (People v Maffei, 35 NY3d 264, 269 [2020] [internal quotation marks and citation omitted]; accord People v Sposito, 193 AD3d 1236, 1237 [3d Dept 2021], affd 37 NY3d 1149 [2022]).
As to defendant's claim that counsel was ineffective for failing to strike a retired correction officer who is now employed by the Sherriff's Department from the jury pool, a for-cause challenge had little to no chance of success given this individual's unequivocal assurances that he could be fair and impartial (see People v Contompasis, 236 AD3d at 152; People v Alger, 206 AD3d at 1053). We also cannot say the use of defendant's [*10]last peremptory strike on the prospective juror immediately preceding the juror now at issue, rather than the latter, was not a strategic or tactical decision on the part of trial counsel (see People v Rivera, 239 AD3d 1045, ___, 2025 NY Slip Op 03362, *5 [3d Dept 2025]; cf. People v Hooper, 238 AD3d 1207, 1211 [3d Dept 2025]). Nor do we find counsel to have been ineffective for failing to object to expert testimony opining that the victim's death was categorized as a homicide. Although this was a factual determination left to the province of the jury, upon cross-examination defendant elicited that this was a medical opinion (see People v Every, 146 AD3d 1157, 1166 [3d Dept 2017], affd 29 NY3d 1103 [2017]). Consequently, viewed in totality and as of the time of representation, we are satisfied that defendant received meaningful representation (see People v Hoyt, 237 AD3d 1360, 1363 [3d Dept 2025]; compare People v Franklin, 237 AD3d 1246, 1250 [3d Dept 2025]).
Finally, despite defendant's lack of any criminal history, considering the facts presented — namely that his callous actions resulted in the death of the victim — we do not find the sentence imposed, including the imposition of consecutive terms of incarceration, to be unduly harsh or severe (see People v Cruz, 238 AD3d at 1331; People v Bova, 232 AD3d 939, 940 [3d Dept 2024]). Consequently, we decline defendant's invitation to reduce or modify the sentence in the interest of justice (see CPL 470.15 [3] [c]; [6] [b]).
Clark and Pritzker, JJ., concur.
McShan, J. (dissenting). We primarily write to respectfully express our disagreement with our colleagues' decision to eschew corrective action in this case based upon County Court's unsupported decision to anonymize potential and empaneled jurors during the selection process. To that end, although we agree with our colleagues in the majority that this particular error does not implicate the mode of proceedings, it warrants our intervention in the interest of justice. At the time of trial, this procedure had no statutory authority whatsoever and, to the extent it could be employed at all, adequate safeguards were absolutely necessary. Acknowledging the severity of the reprehensible conduct that defendant was convicted of, we note that the result reached by the majority implicates a greater concern: confidence that defendant's conviction is grounded entirely in the evidence presented and not based upon the jury's impression of him prior to the introduction of that evidence. Avoiding corrective action in this case based upon an entirely obvious and avoidable error not only diminishes its severity but threatens to cast doubt on the soundness of defendant's conviction.
To begin, we would note the People's concession that the empaneling of an anonymous jury in this case would warrant reversal based upon our recent precedent (see People v Tenace, 229 AD3d 908 [3d Dept 2024]; People v Heidrich, 226 AD3d 1096 [3d Dept 2024], lv denied 42 NY3d 927 [[*11]2024]). In line with that concession, it is clear that the record contains no indicia that concealing the names of the jurors was at all warranted based upon some real or threatened danger to the jury and, even if that were true, the trial court took no steps to limit any potential prejudice to defendant (see People v Flores, 32
NY3d 1087, 1088 [2018]).[FN1] There is no dispute that, at the time of trial, there was no statutory authority for concealing the names of jurors (compare CPL 270.15 former [1-a], with CPL 270.15 [1-a]). The recent amendments to CPL 270.15 (1-a) would now permit withholding of the jurors' names upon the requisite finding of "good cause to believe that a threat to the safety or integrity of the jury exists." However, beyond emphasizing that defendant failed to preserve his argument at trial, the People further insist that the jury empaneled here was not anonymous. In advancing that position, the People highlight the uncontested fact that defense counsel was in possession of the jury venire. We believe that the People's argument misses the mark.
The People's position advances a limited definition of what constitutes an anonymous jury, predicated solely on the knowledge of defendant, counsel and the court. Such a narrow construction is inconsistent with the relevant statutes and precedent that affect the use of anonymous juries. The term "anonymous jury" is not readily defined in our state's case law, and a review of precedent from varying jurisdictions suggests that anonymity is interpreted across a spectrum that encapsulates myriad types of information (see People v Flores, 153 AD3d 182, 190 [2d Dept 2017], affd 32 NY3d 1087 [2018]; see also State of Hawai'i v Lafoga, 152 Haw 529, 533, 526 P3d 506, 510 [2023]; Commonwealth v Fujita, 470 Mass 484, 487, 23 NE3d 882, 886 [2015]; State of Wisconsin v Tucker, 2003 WI 12, ¶ 18, 259 Wis 2d 484, 497, 657 NW2d 374, 380 [2003]; Leonardo Mangat, A Jury of Your [Redacted]: The Rise and Implications of Anonymous Juries, 103 Cornell L Rev 1621, 1625-1628 [2018]; compare People v Goodwin, 59 Cal App 4th 1084, 1092, 69 Cal Rptr 2d 576, 581 [1997], with Erickson v Superior Ct., 55 Cal App 4th 755, 758, 64 Cal Rptr 2d 230, 232 [1997]). Nevertheless, in assessing how to define anonymity in this state, the plain language of CPL 270.15 (1) (a) is instructive. The statute mandates that "the court . . . direct that the names of not less than twelve members of the panel be drawn and called as prescribed by the judiciary law" (CPL 270.15 [1] [a] [emphasis added]), providing a clear indication that the names of the prospective jurors must be announced during voir dire unless otherwise permitted by the statute, which, at the time of trial, provided no mechanism for shielding the names of potential or empaneled jurors (see People v King, 27 NY3d 147, 155-156 [2016]; People v Heidrich, 226 AD3d at 1098; People v Wilborn, 164 AD3d 530, 531 [2d Dept 2018], lv denied 32 NY3d 1069 [2018]). To this point, the [*12]statutory mandate to "call" the names of prospective jurors indicates that a deviation from that practice implicates some degree of anonymity (see People v Flores, 153 AD3d at 189).
Further buttressing that understanding are the necessary considerations for utilizing an anonymous jury. To reiterate, at the time of defendant's trial, anonymizing the name of prospective jurors had "no statutory justification, as CPL 270.15 (1-a) merely permit[ted] the withholding of residential or business addresses of prospective jurors upon a showing of good cause" (People v Tenace, 229 AD3d at 911). Thus, to the extent that an anonymous jury was at all permissible at that time, a court considering the use of the procedure would have to ensure a defendant's opportunity to engage in meaningful voir dire while also giving adequate consideration to the reality that anonymity "may undermine the presumption of innocence by conveying [to the jury], before any evidence is presented, that the defendant is a dangerous person from whom the prospective jurors must be protected" (People v Flores, 153 AD3d at 191-192; see People v Tenace, 229 AD3d at 912; see also United States v Thomas, 757 F2d 1359, 1363 [2d Cir 1985], cert denied 474 US 819 [1985]; United States v Millan-Colon, 834 F Supp 78, 82 [SD NY 1993]).[FN2] The recent amendments to CPL 270.15 in 2024 further support this point (see L 2024, ch 622, §§ 1-3), as the legislative changes added the requirement that "[i]f the court determines that a protective order should be issued and that all jurors or prospective jurors shall be identified by some means other than their names and business or residential addresses," it must "instruct the jury that the fact that the jury was selected on an anonymous basis is not a factor from which any inference unfavorable to the defendant may be drawn" (CPL 270.15 [1-b] [emphasis added]). That language indicates that the jury's knowledge of that information is indeed implicated when the court prohibits its disclosure on the record. Moreover, it is notable that the statute does not permit the court to withhold the names of prospective jurors from defense counsel under any circumstances (see CPL 270.15 [1-a]). That second consideration necessitates that the jury be given a limiting instruction when such information is shielded in order to dissipate the potential for the jury to make a negative inference against a defendant (see People v Flores, 153 AD3d at 192-193). With that understanding, it is clear that the People's limited definition of anonymity ignores that, regardless of whether the prospective jurors' names are provided to defendant, the jurors' perception and understanding remains the same, as does the need for a cautionary instruction (see id.; see also CPL 270.15 [1-b]). The distinction advanced by the People, predicated solely on defendant's knowledge of the names on the jury venire, would all but render that edict meaningless. All told, regardless of how one characterizes the [*13]degree of anonymity employed in this case, which utilized numbers and initials, it is clear that it falls somewhere on the spectrum of anonymity (see People v Flores, 153 AD3d at 190), warranting "close judicial scrutiny" (United States v Thomas, 757 F2d at 1363).
In advancing their position at oral argument, the People also attempted to distinguish relevant precedent and the jury's potential perception of defendant from the facts of this case — one in which there is no indication that defendant's knowledge of their identities posed any danger to potential jurors. Although this case differs from those in which an anonymous jury was utilized for trial in the prosecution of gang-related crimes (see People v Flores, 153 AD3d at 188; see also United States v Thai, 29 F3d 785, 800-801 [2d Cir 1994], cert denied 513 US 977 [1994), organized crime (see United States v Vario, 943 F2d 236, 241 [2d Cir 1991], cert denied 502 US 1036 [1992]) and acts of terrorism (see United States v Stewart, 590 F3d 93, 124-125 [2d Cir 2009], cert denied 559 US 1031 [2010]; United States v Pugh, 150 F Supp 3d 218, 223 [ED NY 2015]), that distinction is of no moment. Prior to the 2024 amendment to CPL 270.15 (1-a), whether or not to anonymize the jury required a sufficient factual predicate to employ the "extraordinary procedure" (People v Flores, 32 NY3d at 1088), which entailed consideration of the potential for the jury, who would have no knowledge of defendant's violent/nonviolent background, to draw a negative inference from the concealment of their names, particularly at a point in the trial before any evidence is presented (see People v Flores, 153 AD3d at 195).[FN3] The People's argument is further diminished by the fact that the most serious charge in this case was murder in the second degree and, although defendant had no criminal history or other history of violent conduct that might have supported concealing the jurors' identities, prospective jurors would be shielded from such information at the time of jury selection. Indeed, various prospective jurors indicated their reluctance to sit on the jury based upon the nature of that charge. Acknowledging that some of those concerns seemingly arose from the prospective jurors' reluctance to weigh in on such a serious charge, those sentiments only underscore the delicate nature of a jury's impressions of a defendant, particularly during jury selection. That much is common to all prosecutions, including those that differ from the above-referenced types of crimes, as the guiding principles underlying the use of anonymous juries remain the same; specifically, as it concerns the presumption of innocence that is afforded to every defendant in a criminal proceeding, it is the risk of speculation by the jury that warrants the various findings necessary to proceed with anonymizing the jury regardless of the alleged criminal conduct underlying the prosecution.
The People also advanced at oral argument that there would be no danger [*14]that the jury would infer that defendant was dangerous as they would have likely assumed that the use of initials and jury numbers was normal practice and procedure. Beyond the fact that this argument is contrary to the People's concession that if the jury was anonymous in this case it would necessitate a new trial, the claim has no merit as it seemingly invokes a harmless error analysis that this Court has rejected with respect to the use of an anonymous jury (see People v Heidrich, 226 AD3d at 1099; see also People v Flores, 153 AD3d at 193-195). In any event, both our prior precedent and the recent amendments to CPL 270.15 require that a court provide a limiting instruction, which is indicative of the general understanding that a jury is more likely to assume the exact opposite (see CPL 270.15 [1-b]; People v Tenace, 229 AD3d at 912; but see Perez v People, 2013 CO 22, ¶ 20, 302 P3d 222, 226 [2013]).[FN4]
Indeed, the People's position is readily contradicted by the fact that limiting or curative instructions are used frequently to dissipate the potential for prejudice (see People v Smith, 237 AD3d 1367, 1375 [3d Dept 2025]; People v Maisonette, 192 AD3d 1325, 1329 [3d Dept 2021], lv denied 37 NY3d 966 [2021]; People v Hamilton, 176 AD3d 1505, 1507 [3d Dept 2019], lv denied 34 NY3d 1128 [2020]), as courts generally infer that a jury will adhere to any instructions given (see People v Moore, 71 NY2d 684, 688 [1988]; but see Leonardo Mangat, A Jury of Your [Redacted]: The Rise and Implications of Anonymous Juries, 103 Cornell L Rev at 1643). Said simply, "[a]lthough anonymity may also imply a legitimate concern for juror privacy unrelated to the dangerousness of a defendant in a criminal case, there is a significant risk that members of the jury might infer that their names were being withheld to protect them from defendant or others acting on his behalf" (People v Flores, 153 AD3d at 192 [internal quotation marks, ellipsis and citation omitted]).[FN5] There undoubtedly will be instances where a defendant might agree with the People's suggestion that a limiting instruction might draw attention to the concealment of the jurors' identities and, therefore, would prefer that a limiting charge not be given (see e.g. People v Flores, 153 AD3d at 186). However, doing so would require that the instruction be affirmatively waived by said defendant, which speaks more to why the preservation rule is applicable under these circumstances (see People v Mack, 27 NY3d at 543; see also People v Bradford, 40 NY3d 938, 939 n 1 [2023]). With such an important constitutional right at stake, we should not assume the more benign of those two possibilities.
Giving due consideration to the relevant principles underlying the required analysis as to the appropriateness of anonymizing the names of jurors, it is clear that the definition of anonymity extends to the knowledge of the jurors. Considering the significance of the jury's determination that defendant acted with the intent [*15]to kill rather than some lesser objective, the potential effect of empaneling an anonymous jury on defendant's presumption of innocence warrants corrective action. We need look no further than the Court of Appeals' characterization of the use of an anonymous jury, even with the proper factual predicate, as an "extraordinary procedure" (People v Flores, 32 NY3d at 1088). The logical import from the Court's statement is that an error in the process is equally extraordinary and warrants corrective action. Moreover, although defendant was aware of the names of the jurors, that does not resolve the effect that employing an anonymous jury has on the presumption of innocence. Although not expressly stated, the majority's decision to forgo corrective action in this case appears to be founded on the conclusion that the error itself is not significant; in other words, a harmless error analysis without explicit reference, which, as previously noted, this Court has already rejected when addressing the improper use of an anonymous jury (see People v Tenace, 229 AD3d at 911; People v Heidrich, 226 AD3d at 1099; People v Flores, 153 AD3d at 195). All told, regardless of preservation, the principle remains that an appellate court is not in a position to "adjudge the causal effect that the error in empaneling an anonymous jury might have had on the jury's verdict" (People v Flores, 153 AD3d at 194-195). For these reasons, we believe corrective action is warranted in this case and would reverse and remit for a new trial.
Finally, we note our disagreement with the majority's determination that a modification to defendant's sentence in the interest of justice is unwarranted (see CPL 470.15 [3] [c]; [6] [b]). To be sure, we firmly believe that defendant's criminal conduct was abhorrent and is deserving of a lengthy sentence. However, the context of that conduct is critical in that assessment and, when considering the absence of any criminal history and the victim's conduct that spurred defendant's actions, we believe the imposition of consecutive sentences and the maximum term on each offense is excessive. Defendant is paying the consequences for a series of poor choices that occurred over the span of mere minutes. That conduct was spurred by the victim forcibly taking defendant's wallet, which contained a significant sum of money and, more importantly, documents pertaining to his child. Notably, the taking occurred immediately after the victim deceived defendant into opening his wallet by requesting money to buy food, which defendant was in the midst of obliging. We do not intend to diminish the severity of defendant's conduct nor suggest that defendant was at all justified in his response. But in our view, the imposition of consecutive sentences, both of which are for the maximum permissible term, is excessive when considering these facts (see generally People v Parker, ___ AD3d ___, ___, 231 NYS3d 276, 284 [3d Dept 2025], lv denied 43 NY3d 1047 [2025]). For these [*16]reasons, we would run the sentences concurrent and grant a minimal reduction to the minimum term of his sentence on the murder conviction as an exercise of discretion and in the interest of justice.
Garry, P.J., concurs.
ORDERED that the judgment is affirmed.

Footnotes

Footnote 1: 
The count of 
murder in the second degree, as charged in count 2 of the indictment, alleging 
that defendant was acting with depraved indifference to human life, was 
dismissed on consent prior to submission to the jury. Upon defendant's request, 
the charge of manslaughter in the first degree, as charged in count 3 of the 
indictment, together with manslaughter in the second degree were submitted to 
the jury as lesser included offenses of the remaining charge of murder in the 
second degree.
Footnote 1: There is no dispute that, at 
the time of trial, there was no statutory authority for concealing the names of 
jurors (compare CPL 270.15 former [1-a], with CPL 270.15 
[1-a]). The recent amendments to CPL 270.15 (a-a) would now permit withholding 
of the jurors' names upon the requisite finding of "good cause to believe that a 
threat to the safety or integrity of the jury exists."
Footnote 2: The recent amendements to CPL 
270.15 in 2024 further support this point (see L 2024, ch 622, § §
1-3), as the legislative changes added the requirement that "[i]f the court 
determines that a protective order should be issued and that all jurors or 
prospective jurors shall be identified by some means other than their names 
and business or residential addresses," it must "instruct the jury that the 
fact that the jury was selected on an anonymous basis is not a factor from which 
any inference unfavorable to the defendant may be drawn" (CPL 270.15 [1-b] 
[emphasis added]). That language indicates that the jury's knowledge of that 
information is needed implicated when the court prohibits its disclosure on the 
record. Moreover, it is notable that the statute does not permit the court to 
withhold the names of prospecitve jurors from defense counsel under any 
circumstances (see CPL 270.15 [1-a]).

Footnote 3:
The People's argument is further diminished by the fact that the most serious 
charge in this case was murder in the second degree and, although defendant had 
no criminal history or other history of violent conduct that might have 
supported concealing the jurors' identities, prospective jurors would be 
shielded from such information at the time of jury selection. Indeed, various 
prospective jurors indicated their reluctance to sit on the jury based upon the 
nature of that charge. Acknowledging that some of those concerns seemingly arose 
from the prospective jurors' reluctance to weigh in on such a serious charge, 
those sentiments only underscore the delicate nature of a jury's impressions of 
a defendant, particularly during jury selection.
Footnote 4:Federal courts similarly mandate, in consideration of whether an anonymous jury was properly employed, due consideration of the "balance between the integrity of the criminal justice system and the jurors' concern for their own well-being, and the preservation and meaningful efficacy of the presumption of innocence" (United States v Pugh, 150 F Supp 3d at 220-221 [internal quotation marks, brackets and citation omitted]). If anonymity is appropriate, "the court should give the jurors a plausible and nonprejudicial reason for not disclosing their identities or for taking other security measures" (United States v Herron, 2 F Supp 3d 391, 396-397 [ED NY 2014] [internal quotation marks and citation omitted], affd 762 Fed Appx 25 [2d Cir 2019], cert denied ___ US ___, 141 S Ct 262 [2021]; see United States v Vario, 943 F2d at 241; but see United States v Gotti, 459 F3d 296, 345 [2d Cir 2006], cert denied 551 US 1144 [2007]; United States v Tutino, 883 F2d 1125, 1133 [2d Cir 1989], cert denied 493 US 1081 [1990]).

Footnote 5:
There undoubtedly will be instances where a defendant might agree with the 
People's suggestion that a limiting instruction might draw attention to the 
concealment of the jurors' identities and, therefore, would prefer that a 
limiting charge not be given (see e.g. People v Flores, 153 
AD3d at 186). However, doing so would require that the instruction be 
affirmitively waived by said defendant, which speaks more to why the 
preservation rule is applicable under these circumstances (see People v Mack, 
27 NY3d at 543, see also People v Bradford, 40 NY3d 938, 939 n 1 
[2023]).